UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :

UNITED STATES OF AMERICA

                                                :

          - v. -                      :          22 Cr. 395 (ER)

                                                  :

SETH MARKIN,

                                                :

               Defendant.

                                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SETH MARKIN'S PRETRIAL MOTIONS

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York
                                        One St. Andrew's Plaza
                                        New York, New York 10007

Negar Tekeei
Nicolas Roos
Kiersten Fletcher
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

RELEVANT BACKGROUND .......................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    There Is No Basis to Suppress Markin's Statements to FBI Agents ................................. 3

      A.   *Garrity v. New Jersey* and "Economic Coercion"……………………………………6

      B.   Custodial and Non-Custodial Interrogations ………………………………………..…10

      C.   Markin's Statements Were Voluntary and Are Not Subject to Suppression………...11

           1.   Markin's *Garrity* claim cannot succeed because he was not threatened with
                termination or an adverse impact on his employment……………………..………11

           2.   Markin's statements were voluntary..……………………………………………14

           3.   Markin's false statements are not subject to suppression..…………......………16

           4.   Markin's suspended security clearance, related suspension from duty, and
                being escorted out of the FBI Academy after his interview have no bearing
                on his claims of coercion during the interview…..………………….....…………17

II.   The Indictment Is Not Multiplicitous ........................................................................... 18

      A.   Multiplicity……………………………….…………………………………………19

      B.   The Title 15 Insider Trading Securities Fraud (Counts Two through Nine) and
           Title 15 Tender Offer Fraud (Counts Seventeen through Twenty-Four) Charges
           Are Not Multiplicitous…………..…………………………………….…….………20

      C.   The Title 18 Securities Fraud Charge (Count Sixteen) is Not Multiplicitous of
           the Title 15 Insider Trading Securities Fraud Charges or the Title 15 Tender
           Offer Fraud Charges…………………………………………………………………22

      D.   Dismissal Would Be Premature…………………………………………………..24


CONCLUSION.................................................................................................................... 25

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion filed by defendant Seth Markin ("Markin" or "the defendant") on December 29, 2022, which seeks an order (1) suppressing statements the defendant made to law enforcement agents during a voluntary interview, and (2) dismissing certain counts of the Indictment as multiplicitous. For the reasons that follow, Markin's suppression motion is meritless and should be denied without a hearing. Likewise, as set forth below, Markin misapprehends the elements of the charges against him and his motion to dismiss certain counts of the indictment as multiplicitous should be denied.

## RELEVANT BACKGROUND

Indictment 22 Cr. 395 (ER) (the "Indictment") was filed on July 21, 2022, and charged the defendant with one count of conspiracy to commit securities fraud and tender offer fraud, in violation of 18 U.S.C. § 371 (Count One); eight counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5, 240.10b5-1, and 240.10b5-2, and 18 U.S.C. § 2 (Counts Two through Nine); securities fraud, in violation of 18 U.S.C. §§ 1348 and 2 (Count Sixteen); tender offer fraud, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.FR. §§ 240.14e-3(a) & 240.14e-3(d), and 18 U.S.C. § 2 (Counts Seventeen through Twenty Four); and false statements, in violation of 18 U.S.C. § 1001(a)(2) (Count Thirty-One). (Dkt. 1).[1]

Those charges stem from Markin's participation in a scheme to trade in stock of Pandion Therapeutics ("Pandion") based on inside information that he misappropriated from his then-girlfriend, who was an attorney at a major law firm assigned to work on the acquisition of Pandion by Merck & Co. ("Merck"). (Ind. ¶ 1). Markin secretly looked through his girlfriend's

---

[1] "Dkt. [Number]" refers to a docket entry in this case, and "Ind." refers to the Indictment in this case. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

confidential work documents, without her permission, and learned that in a matter of weeks, Merck was going to acquire Pandion for approximately three times the value of Pandion's then-share price. (*Id.*). After misappropriating the confidential information, Markin purchased shares in Pandion, and tipped several friends and family members, including his co-defendant, Brandon Wong. (*Id.*). Text messages between Markin and Wong reveal how the defendant tipped Wong and others, the nature of his tips (including how Pandion stock was going to "EXPLODE" when the news of the merger dropped, that they were going to get "TRIPLE GAINS!", and details of the timing of the transaction), and encouraged Wong and others to purchase shares of Pandion. (*Id.* ¶¶ 14-18). After Merck's acquisition of Pandion was announced publicly, and the Pandion stockholdings of Markin, Wong, and those whom they tipped significantly increased in value, Markin and Wong sold their shares of Pandion for significant profits. (*Id.* ¶ 4).

At the time of the relevant trades, Markin had been accepted into the Federal Bureau of Investigation ("FBI") as a new agent trainee. (*Id.* ¶ 1). To conceal their illegal insider trading scheme, Markin and Wong used an encrypted messaging application and deleted many of their text messages with each other. (*Id.* ¶ 21). They also agreed on a cover story that they could provide to law enforcement, namely, that if they were asked how they anticipated Pandion's stock price increase, they could say they "read it on Stocktwit," a social media platform for sharing stock ideas, and falsely say that the news was "publicly being announced there." (*Id.*).

In or about June 2021, after Markin and his girlfriend had ended their relationship, and as Markin was preparing to begin training as a new agent at the FBI Academy in Quantico, Virginia, Markin's former girlfriend called him to ask why his name had come up in an inquiry by the Financial Industry Regulatory Authority ("FINRA") into trading in Pandion stock. (*Id.* ¶ 5). In response, Markin lied to her, falsely claimed that he did not trade in Pandion stock, and told her

that FINRA must have been referring to a different person named "Seth Markin" who also lived in Falls Church, Virginia, where Markin maintained an apartment. (*Id.* ¶ 22).

Then, on November 18, 2021, Markin lied to FBI agents when he was interviewed about his Pandion trading. (*Id.* ¶ 5). That day, Special Agents from the FBI interviewed Markin in connection with an investigation they told him was being conducted by law enforcement in the Southern District of New York relating to insider trading in Pandion stock. (*Id.* ¶ 23). During the interview, Markin adhered to the fake cover story he and Wong had concocted, and falsely told the agents (i) that he learned about Pandion on StockTwits, (ii) that he purchased the stock because of a recent earnings report and a new board member addition, and (iii) that he did not know that his former girlfriend worked on the Pandion transaction. (*Id.*).

## ARGUMENT

### I.   There Is No Basis to Suppress Markin's Statements to FBI Agents

Long before Markin was arrested on the charges in this case, two FBI agents interviewed him on November 18, 2021, while he was a new agent trainee at the FBI Academy in Quantico, Virginia.[2] The day before the interview, Markin was told to report to his supervisor's office the following morning. (Def. Aff. ¶ 7). The next morning, before the interview, Markin met with a supervisor regarding an exam he had failed during his training and signed a form indicating that he had failed the exam. (*Id.*) After meeting with his supervisor, Markin was led to a conference room, where he met with the two interviewing FBI agents. (*Id.*) It is undisputed that Markin was not placed under arrest, handcuffed or otherwise physically restrained at any point during the interview; that he was not threatened at any point during the interview, either verbally or

---

[2] The Government's factual recitation is limited to those facts material to the instant motion and, for purposes of this submission only, assumes certain of the facts alleged by the defendant in the affidavit he submitted in support of his motion are true. (*See* Dkt. 44, Ex. C ("Def. Aff.")).

physically; and that he was never told that his employment at the FBI Academy would be terminated unless he participated in the interview. (*See* Def. Aff. (alleging circumstances of the interview and containing no allegations of physical restraint, threats, or statements from agents that he would be terminated unless he participated in the interview)). It is also undisputed that, in advance of questioning by agents, Markin, then a 30-year-old college graduate who was training to be an FBI agent, signed a form advising him that the interview was voluntary and that no disciplinary action would be taken against him by the FBI or the Department of Justice if he chose not to answer questions. (Dkt. 44, Ex. C). The form stated:

> You are being asked to provide information as part of a criminal investigation being conducted by the United States Attorney's Office for the Southern District of New York (the "SDNY") and the Federal Bureau of Investigation New York Field Office (the "FBI-NY"). The purpose of the investigation is to determine whether one or more federal crimes may have occurred[.]

> This is a voluntary interview. Accordingly, you do not have to answer questions. No disciplinary action will be taken against you by the FBI or Department of Justice if you choose not to answer questions. If you choose to voluntarily answer questions, you must do so truthfully. It is a federal crime to lie to federal agents.

> Any statement you furnish may be used as evidence in any future criminal proceedings or agency disciplinary proceeding, or both.

(*Id.*). On the form, Markin wrote his name, the date and time of the interview, the place of the interview, and signed his name under a section that stated, in bold and capital letters, "**ACKNOWLEDGMENT**," and "I understand the warnings and assurances stated above and I am willing to make a statement and answer questions. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." (*Id.*).

Nonetheless, Markin moves to suppress statements he made – many of which were materially false – to the interviewing agents on the grounds that his statements were not voluntary because he subjectively believed "that his failure to participate in the interview would result in his

termination as an FBI agent/trainee," and that "any reasonable individual confronted with the conduct of Markin's supervisors at the Academy and the statements made by the lead agent during the interview, would have assumed that his/her refusal to participate in the interview would have a substantial negative impact upon his/her employment." (Dkt. 44 at 9). Markin's reliance on *Garrity v. New Jersey*, 385 U.S. 493 (1967), and challenges to the voluntary nature of his non-custodial interview fail as a matter of law.

As set forth in greater detail below, to make out a claim for economic coercion, Markin must demonstrate that he was explicitly threatened with loss of employment if he did not cooperate in the investigation. *See United States v. Johnson*, 131 F.3d 132, 1997 WL 792443, at *2 (2d Cir. 1997) (defendant's "alleged belief that he was required to provide information to law enforcement officials or lose his job, based on his subjective understanding of his employer's disciplinary rules, will not give rise to a *Garrity* inadmissibility because he was never explicitly threatened with termination of his employment"). Here, there is no allegation that Markin was explicitly threatened with loss of employment if he did not speak with agents. As a result, the rule set forth in *Garrity* does not apply and Markin's motion to suppress can be denied on that basis alone.

Relatedly, absent a specific threat, Markin's subjective belief of adverse consequences if he chose not to speak is not enough to prove coercion because the *objective* evidence demonstrates that was not the case. Markin was never threatened with loss of employment and, to the contrary, indisputably signed a form that explicitly stated the interview was voluntary and no disciplinary actions would be taken against him if he chose not to answer questions.

Moreover, the undisputed circumstances surrounding the interview demonstrate that Markin was not otherwise coerced. He was not under arrest or in custody, and there is no indication of out-of-the-ordinary conduct on the part of agents that amounted to coercion.

Finally, because the balance of Markin's statements were lies, many of which form the basis for the false statements charge in Count Thirty-One of the Indictment, well-established precedent holds that those statements receive no *Garrity* protection and can be used against Markin as to Count Thirty-One.

Markin's motion should be denied without an evidentiary hearing. However, if this Court holds a hearing, which it need not, the Government expects that the evidence would confirm that Markin was never threatened with loss of employment or adverse employment consequences if he chose not to answer the agents' questions; that he was advised verbally and in writing that the interview had nothing to do with his employment and was voluntary, that he did not have to answer any questions, and that no disciplinary action would be taken against him if he chose not to answer questions; that Markin indicated verbally and in writing that he understood those rights both at the beginning of the interview and at the end of the interview; and that, at the end of the interview, Markin thanked the interviewing agents and conveyed his view that the interview had been conducted in a professional manner.

## A. *Garrity v. New Jersey* and "Economic Coercion"

Courts have held that, in certain circumstances, substantial economic coercion can rise to a constitutional dimension, but a defendant must show that the economic threat "deprived him of his free choice to admit, to deny, or to refuse to answer." *Garrity*, 385 U.S. at 496 (1967); *see also Uniformed Sanitation Men Ass'n, Inc., v. Commissioner of Sanitation of City of New York*, 392 U.S. 280 (1968) (threat of termination of employment).

In *Garrity*, the Supreme Court held that statements obtained from police officers, who were suspected of corruption, in circumstances in which a state statute would have required the termination of their employment had the officers declined to answer were involuntary and

therefore inadmissible against them in a criminal trial. Each officer made his statement to investigators after being explicitly warned that an invocation of his Fifth Amendment right not to answer "would [render him] subject to removal from office." 385 U.S. at 494. That sanction was required by a state statute that provided that any public employee who "took the Fifth" in any type of hearing on a matter related to his employment or duties "shall thereby forfeit his office, position or employment and any vested or future right of tenure or pension granted to him," and further provided that the employee "shall not thereafter be eligible for election or appointment to any public office, position or employment in this State." N.J. Rev. Stat. § 2A:81-17:1 (Supp. 1965), N.J.S.A., quoted in *Garrity*, 385 U.S. at 495. The Supreme Court held as follows:

> The choice given petitioners was either to forfeit their jobs or incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice . . . is likely to exert such pressure upon an individual as to disable him from making a free and rational choice. We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary.

385 U.S. at 497-98.

Because the decision to make statements was made under this substantial coercive pressure, that choice was not voluntary. "Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other." *Id*. at 498. Thus, when economic pressure is sufficiently substantial as to put the defendant "between the rock and the whirlpool," so "as to disable [the defendant] from making a free and rational choice," such pressure renders the statement "involuntary." *Id*. at 497-98. "The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer'" by the economic pressure. *Id*. at 496.

Losing one's "means of livelihood" can in some circumstances constitute a sufficient threat. *Garrity*, 385 U.S. at 497; *Lefkowitz v. Turley*, 414 U.S. 70, 83 (1973). However, even loss

of a job is not necessarily a sufficient level of economic coercion. *See United States ex rel. Sanney v. Montanye*, 500 F.2d 411, 415 (2d Cir. 1974). As the Supreme Court explained in *Minnesota v. Murphy*, 465 U.S. 420 (1984), a case that concerned a threat to revoke the defendant's probation, in each of "so-called 'penalty' cases, the state . . . sought to induce [the defendant] to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" *Id.* at 4343. The Court rejected Murphy's claim that he had been subjected to Fifth Amendment coercion, finding that there was "no reasonable basis for concluding that [the state] attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination." *Id.* at 438. The *Murphy* Court distinguished *Garrity* on this basis as a case in which the witnesses had been "expressly informed" that the coercive penalty would be imposed if they invoked their privilege against self-incrimination. *Id*. at 437-38. As the Seventh Circuit has explained, "the Court in *Murphy* held that the lesser price that consists of a merely plausible fear that invoking one's Fifth Amendment privilege will get one into trouble . . . is not a heavy enough penalty to excuse the failure to assert the privilege." *United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003) (emphasis added).

Consistent with these precedents, courts have rejected claims of economic coercion in the absence of an express threat that termination will result from the defendant's invocation of his Fifth Amendment rights. A directive that termination "may" result does not establish adequate coercion. *See Singer v. Maine*, 49 F.3d 837, 847 (1st Cir. 1995) (regulations providing that "immediate dismissal may result" were insufficient to meet standard); *cf. United States v. Stein*, 440 F. Supp. 2d 315, 328 (S.D.N.Y. 2006) ("*Garrity* therefore is best understood as holding that the existence of the statute mandating termination" constituted coercion).

Moreover, "an individual claiming that a statement was compelled in violation of the Fifth Amendment must adduce evidence *both* that the individual subjectively believed that he or she had no real choice but to speak *and* that a reasonable person in that position would have felt that way." *Stein*, 440 F. Supp. 2d at 328. Absent a specific threat, a defendant's subjective belief that he would be fired if he did not speak is not enough to prove coercion under *Garrity*. *See Johnson*, 1997 WL 792443, at *2 (defendant's "alleged belief that he was required to provide information to law enforcement officials or lose his job, based on his subjective understanding of his employer's disciplinary rules, will not give rise to a *Garrity* inadmissibility because he was never explicitly threatened with termination of his employment"); *see also United States v. Solomon*, 509 F.2d 863, 865 (2d Cir. 1975) (holding that there was no coercion where the defendant alleged that he spoke with the NYSE under threat of economic harm because he "was aware of" the NYSE's policy that they were "empowered" to "suspend [him] if [he] refused to cooperate and answer all questions."); *United States v. Roberts*, 660 F.3d 149, 157 (2d Cir. 2011) (requiring that defendant show "a significant *threat* of economic harm") (emphasis added).

It is well established that even if *Garrity* precludes the use of protected statements in a criminal prosecution regarding the investigated matter to which the statements relate, *Garrity* does not protect false statements, and that *Garrity* protected statements *can* be used in prosecutions for perjury, making false statements, and obstruction of justice. *See U.S. ex rel. Annunziato v. Deegan*, 440 F.2d 304, 306 (2d Cir. 1971) (in prosecution for perjury, holding that "while a public employee may not be put to the Hobson's Choice of self-incrimination or unemployment, he is not privileged to resort to the third alternative, i.e., lying.") (citing *United States v. Knox*, 396 U.S. 77, 82 (1969)); *United States v. Waldon*, 363 F.3d 1103, 1112–13 (11th Cir. 2004) (defendant "undisputedly lied to the grand jury, and *Garrity* does not protect false testimony"); *United States v. Veal*, 153 F.3d

1233, 1244 (11th Cir. 1998), *overruled on other grounds by Fowler v. United States*, 563 U.S. 668 (2011) (adopting the Second Circuit's reasoning in *Annunziato* and holding that, while officers feared losing their jobs if they invoked the Fifth Amendment and remained silent in connection with an investigation into their wrongdoing, "*Garrity* did not afford them refuge to give false statements to investigators and not be prosecuted for obstruction of justice.").

## B. Custodial and Non-Custodial Interrogations

As the Supreme Court explained in *Miranda v. Arizona*, 384 U.S. 436 (1966), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. A "custodial interrogation" occurs when "an interrogation of the defendant" takes place "while she is in 'custody.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011). "The test for custody is an objective one: 'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'" *United States v. Newton*, 369 F.3d 659, 671 (2d Cir. 2004). "[I]n the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey[ed] the message that the defendant is not free to leave," *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992), or that she was "completely at the mercy of the police." *Newton*, 369 F.3d at 675. An "interrogation" in this context means "words or actions on the part of police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980); *accord United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017) (same).

Apart from the *Miranda* analysis, which "sweeps more broadly than the Fifth Amendment itself," it remains true that non-custodial statements "obtained by 'techniques and methods

offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will'" are prohibited by the Fifth Amendment. *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998) (quoting *Oregon v. Elstad,* 470 U.S. 298, 304 (1985)). This analysis depends on the "totality of the circumstances," *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988), and "[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States v. Washington*, 431 U.S. 181, 187 (1977).

### C. Markin's Statements Were Voluntary and Are Not Subject to Suppression

Markin's motion to suppress and supporting affidavit are noteworthy for what they do *not* allege. Markin does *not* claim that he was threatened with loss of employment or adverse consequences to his employment. Markin does *not* claim that he was in "custody" and that agents were required to read him a *Miranda* warning before speaking to him. And, Markin does *not* claim that he was truthful during his interview when he told the agents (i) that he learned about Pandion on StockTwits, (ii) that he purchased the stock because of a recent earnings report and a new board member addition, and (iii) that he did not know that his former girlfriend worked on the Pandion transaction. Accordingly, Markin's statements are admissible as a matter of law.

### 1. Markin's *Garrity* claim cannot succeed because he was not threatened with termination or an adverse impact on his employment.

Markin's purported subjective belief, even if true and reasonable (which it was not), that he would be terminated if he did not answer the agents' questions is not enough to establish coercion under *Garrity*. The holding in *Garrity* turned on the fact that the officers were explicitly warned that an invocation of their Fifth Amendment right not to answer would render them subject to removal from office. 385 U.S. at 494. The law is clear, however, that where a defendant has not been "expressly informed" that his invocation of his rights will trigger a coercive penalty, "the

lesser price that consists of a merely plausible fear that invoking one's Fifth Amendment privilege will get one into trouble . . . is not a heavy enough penalty to excuse the failure to assert the privilege." *Cranley*, 350 F.3d at 622.  Accordingly, as noted, the Second Circuit has held that a defendant's "alleged belief that he was required to provide information to law enforcement officials or lose his job, based on his subjective understanding of his employer's disciplinary rules, will not give rise to a *Garrity* inadmissibility because he was never explicitly threatened with termination of his employment." *Johnson*, 1997 WL 792443, at *2 (citing *United States v. Indorato*, 628 F.2d 711, 716 (1st Cir. 1980).  In *Johnson*, the Second Circuit relied on the First Circuit's opinion in *United States v. Indorato*, in which the court rejected a police officer's contention that his incriminating statement to a superior was coerced because departmental regulations required the dismissal of any officer who refused to obey a lawful order.  628 F.2d at 715.  In doing so, the panel held:

> In all of the cases flowing from *Garrity*, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is a statute or municipal ordinance mandating such procedure. In this case, there was no explicit "or else" choice and no statutorily mandated firing is involved. We do not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within *Garrity*'s cloak of protection.

*Id*. at 716.  Other courts have applied a similar analysis.  *See, e.g.*, *United States v. Bowers*, 739 F.2d 1050, 1056 (6th Cir. 1984) ("Unlike the defendants in *Garrity*, Bowers was not told by agent Layman that he would be disciplined if he refused to answer questions. In fact, Layman testified that discipline would not necessarily have followed had Bowers refused to cooperate."); *Stein*, 440 F. Supp. 2d at 331 (suppressing statements where a private employer, held to be acting at

government direction, threatened to cut off a defendant's legal fees and "*explicitly threatened* to fire him if he did not waive his constitutional rights and proffer.") (emphasis added).

Thus, absent an explicit threat to his employment, Markin's subjective belief that he would be fired if he did not participate in the interview is not enough to establish coercion under *Garrity*. Markin's affidavit attests: "Notwithstanding the contents of the form that I signed, both at the beginning and at the end of the interview, I was under the clear impression that unless I not only participated in the interview, but explained to the satisfaction of the agents the 'evidence' which they claimed to have amassed, I would be terminated as an FBI employee." (Def. Aff. ¶ 17). However, Markin does not allege that he was explicitly threatened in any way with termination of employment if he did not participate in the interview. Instead, Markin alleges that he told the agents "in words or substance" that he assumed he was going to be fired, and asked whether he should resign before he was fired, and that the agents "did not respond to [his] comments beyond reminding [him] that they were questioning [him] as part of a criminal investigation." (Def. Aff. ¶ 15). Those alleged comments make clear that Markin thought he had already lost his job, not that he was at risk of termination if he did not participate in the interview. Markin does not allege that he was expressly threatened with loss of employment if he refused to participate in the interview. The absence of any threats, standing alone, is a basis to deny Markin's *Garrity* claim.

The cases on which Markin principally relies do not hold otherwise. For example, in *United States v. Kaur*, the district court ordered the defendant's statement suppressed because the agent improperly advised the defendant that his *Garrity* rights would only "apply" if he were guilty. *See United States v. Kaur*, No. 08-CR-428 (KAM), 2008 WL 5156582, at *5 (E.D.N.Y. Dec. 8, 2008)). That did not happen here, and there is no allegation that it did. In *United States v. Stein*, the defendant's statements were suppressed when his private employer, who was held to be

acting at law enforcement's direction, "*explicitly threatened* to fire him if he did not waive his constitutional rights and proffer." 440 F. Supp. 2d at 331 (emphasis added). Again, that did not happen here, and there is no allegation that it did.

### 2. Markin's statements were voluntary.

Considering all the circumstances surrounding the agents' conduct during the interview, and even, for present purposes only, assuming the facts set forth in Markin's affidavit, Markin's statements were made voluntarily. Markin was not under arrest or in custody; he was interviewed in the familiar-to-him surroundings of the training academy; he was explicitly advised in writing that the interview was voluntary; he, a college-educated FBI Academy trainee, indicated he understood that the interview was voluntary by writing his name, the date, the place of the interview, and affixing his signature on a written form describing the voluntary nature of the interview; when he stated that he "needed an attorney," the agents immediately ended the interview; and, at the end of the interview, he re-affirmed his understanding that the interview was voluntary by signing and dating a second form attesting to the same. (*See* Def. Aff. ¶¶ 11, 14; Dkt. 44, Ex. C and Ex. D). On this record, there is no indication of out-of-the ordinary conduct on the part of the agents that amounted to coercion.

As an initial matter, the facts, even as portrayed in Markin's affidavit, demonstrate that the agents did not need to provide a *Miranda* warning. A *Miranda* warning is necessary only if a suspect is subjected to custodial interrogation, which requires that the suspect's freedom is curtailed to the degree associated with formal arrest. At no time during the interview was Markin in custody or restrained in any way. When Markin clearly conveyed that he wished to have an attorney, the agents ceased questioning him. (Def. Aff. ¶ 14).

Moreover, situations in which courts have found statements to be "involuntary" for constitutional purposes almost invariably involve governmental acts that so pressured the defendant as to overbear his free choice, or where a defendant was deprived of certain basic needs or subjected to lengthy interrogation under custodial circumstances that impaired his ability to make a free choice. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991) (credible threat of physical violence); *Beecher v. Alabama*, 389 U.S. 35, 36 (1967) (statement obtained after police held a gun to suspect's head); *Payne v. Arkansas*, 356 U.S. 560, 564-65 (1958) (statement obtained after police threatened to turn suspect over to an angry mob); *Malinski v. New York*, 324 U.S. 401, 403, 406-07 (1945) (statement obtained after forcing suspect to remain unclothed); *Reck v. Pate*, 367 U.S. 433, 441 (1961) (statement obtained after depriving suspect of adequate food, sleep, and contact with family); *Brooks v. Florida*, 389 U.S. 413, 414-15 (1967) (statement obtained after depriving suspect of food and keeping suspect unclothed in a small cell). On the other hand, confessions have been ruled admissible when made under circumstances that lack compulsion or coercion, even when they result from a ploy to mislead the suspect. *See, e.g., Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990) (confession obtained by another inmate).

None of the circumstances that would lead to suppression is present here. Instead, Markin complains that, during the interview, he was "told by one of the agents that they were involved in a criminal investigation of insider trading activity," that he was a "target of the investigation," that "the FBI had obtained substantial evidence indicating that [he] was involved in insider trading," and that he, his parents, and other close family members were "likely" to "go to jail" as a result of this evidence. (Def. Aff. ¶ 8). Markin complains that agents confronted whim with text messages between him and one of his tippees, and "demanded" that he explain the meaning of the messages. (Def. Aff. ¶ 13). Markin also states that he was told that, if he "cooperated" in the investigation,

that fact, along with information he provided, would be provided to the United States Attorney's Office. (Def. Aff. ¶ 12).

These are hardly the types of assertions by agents that would form the basis for a valid coercion claim. The Second Circuit has repeatedly recognized that discussions regarding the benefits of cooperation, including the possibility of lenient treatment, are not inherently coercive. *See, e.g., United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("confession is not involuntary merely because the suspect was promised leniency if he cooperated"); *United States v. Bye*, 919 F.2d 6, 9–10 (2d Cir. 1990) (same). Nor do concerns about how the Government might treat loved ones, including discussions regarding the fact that other family members might face charges, suffice to render incriminating statements involuntary. *See, e.g., United States v. Mullens*, 536 F.2d 997, 1000 (2d Cir. 1976) ("[S]o far as we know, no federal court has yet held that a confession or consent is involuntary solely on the ground that it was prompted by the defendant's desire to protect a relative from the rigors of arrest, interrogation and possible confinement.").

Finally, Markin states that, when he "ask[ed] the agents whether [he] should have an attorney with him during the questioning," an agent stated that he (the agent) was not in a position to advise Markin as to whether or not it would be in Markin's best interest to speak to an attorney. (Def. Aff. ¶ 12). In his motion, Markin cites no authority for the proposition that such a statement by a law enforcement agent is in any way improper or a violation of a defendant's Constitutional rights. More relevant is the concession that, when Markin expressly stated he wanted to speak with an attorney, the agents, by Markin's own account, ceased questioning. (Def. Aff. ¶ 14).

### 3. Markin's false statements are not subject to suppression.

Because *Garrity* does not protect false statements in prosecutions for making false statements and obstruction, the Government *can* use Markin's false statements against him to

prove the charges in Count Thirty-One regardless of whether they are otherwise protected by *Garrity* – which, for the reasons set forth above, they are not. The Second Circuit and other courts have held that *Garrity* does not protect against prosecutions for false statements and obstruction of justice. *See U.S. ex rel. Annunziato v. Deegan*, 440 F.2d 304, 306 (2d Cir. 1971) (holding that, "while a public employee may not be put to the Hobson's Choice of self-incrimination or unemployment, he is not privileged to resort to the third alternative, i.e., lying," and where the defendant "was not prosecuted for past criminal activity based on what he was forced to reveal about himself" but was instead "prosecuted for the commission of a crime while testifying, i.e. perjury," the statements in question need not be suppressed); *United States v. Waldon*, 363 F.3d 1103, 1112–13 (11th Cir. 2004) (when defendant "undisputedly lied to the grand jury, *Garrity* does not protect false testimony"); *United States v. Veal*, 153 F.3d 1233, 1244 (11th Cir. 1998) ("We agree with the circuits that have addressed this issue before us and have determined that *Garrity*-insulated statements regarding past events under investigation must be truthful to avoid future prosecution for such crimes as perjury and obstruction of justice. Garrity protection is not a license to lie or to commit perjury.").

Accordingly, Markin's motion to suppress his false statements to the agents can be denied on this basis alone.

### 4. Markin's suspended security clearance, related suspension from duty, and being escorted out of the FBI Academy after his interview have no bearing on his claims of coercion during the interview.

Markin also complains of a host of issues that have no bearing on the merits of his core *Garrity* and voluntariness arguments. For example, Markin complains that circumstances *after* the interview demonstrated that his employment with the FBI was going to be suspended for reasons wholly independent of his interview or the insider trading investigation. Specifically,

Markin points to the asserted facts, that his security clearance with the FBI was to be suspended based on security concerns relating to an allegation that he had failed to disclose the true nature of his relationship with a foreign national and failed to provide truthful answers in connection with a personnel security determination, and that, *after* the interview and *after* he was notified of his suspension, he was escorted out of the FBI Academy at Quantico. (Def. Aff. ¶ 20; Dkt. 44 at 7-8, Ex. F.). But these arguments are red herrings and do not go to Markin's subjective belief or any objective belief about what would happen to his employment at the FBI if he chose not to participate in the interview. The events that occurred *after* Markin's interview could have no impact on any belief as to whether his refusal to participate in the interview would have resulted in his suspension or termination from the FBI. To the contrary, they demonstrate that his suspension was required for reasons independent of the insider trading investigation – namely, is false statements and omissions in connection with his security clearance process.

Markin's motion to suppress should be denied.

## II. **The Indictment Is Not Multiplicitous**

Markin argues that the substantive Title 15 insider trading securities fraud counts of the Indictment (Counts Two through Nine), the substantive Title 15 tender offer fraud counts of the Indictment (Counts Seventeen through Twenty-Four), and the Title 18 securities fraud count of the Indictment (Count Sixteen) are multiplicitous, and that the Government should elect one group of charges with which to proceed while the remaining charges should be dismissed. (Dkt. 44 at 13). Markin first argues that "the elements required to prove the substantive counts of tender offer fraud in this case are identical to those required to prove the substantive charges of [insider trading] securities fraud." (*Id.* at 15). Next, Markin argues that the Title 18 securities fraud charge is multiplicitous of the substantive tender offer fraud and insider trading securities fraud charges. (*Id.* at 17). Therefore, he contends, conviction on all of these offenses would violate the Double

Jeopardy clause. (*Id.*). Markin's motion is meritless and must be denied because the Title 15 substantive insider trading securities fraud, Title 15 substantive tender offer fraud, and Title 18 substantive securities fraud counts charge different offenses and, therefore, are not multiplicitous.

## A. Multiplicity

An indictment is multiplicitous "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999); *accord United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) ("An indictment is multiplicitous when a single offense is alleged in more than one count."). "A claim of multiplicity cannot succeed, however, unless the charged offenses are the same in fact and in law." *Jones*, 482 F.3d at 72 (internal quotation marks omitted).

In assessing a multiplicity challenge, it is "not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense' – in the legal sense, as defined by Congress – complained of in one count is the same as that charged in another." *Chacko*, 169 F.3d. at 146 (citations omitted). As the Supreme Court explained in *Albernaz v. United States*, "It is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause. When the same statutory violation is charged twice, the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution." 450 U.S. 333, 344 n.3 (1981); *see also United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004) (citing *Bell v. United States*, 349 U.S. 81, 83-84 (1955)).

To determine whether a single crime has been charged as two offenses, the courts typically apply the well-established *Blockburger* test "[i]f there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted." *Chacko*, 169 F.3d at 146 (citations omitted); *see also Blockburger v. United*

*States*, 284 U.S. 299, 304 (1932; *United States v. Dixon*, 509 U.S. 688, 697 (1993). If the two offenses are distinct under the *Blockburger* test, then Markin's multiplicity challenge fails unless the court finds clear Congressional intent to bar prosecuting a defendant for both offenses. *See Albernaz*, 450 U.S. at 339-42 (*Blockburger* test controls multiplicity analysis absent a "clear indication of contrary legislative intent.").

This strict focus on the statutory elements rather than the underlying facts reflects the settled rule that an identical set of facts, or a single fact, may properly lead to conviction and punishment under multiple statutes. *See, e.g., United States v. Woodward*, 469 U.S. 105, 107 (1985) (finding that a single factual episode can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause); *Albernaz*, 450 U.S. at 344 n.3 (same); *Harris v. United States*, 359 U.S. 19 (1959) (finding that consecutive sentences were permitted where single transaction violated two distinct statutory provisions).

## B. The Title 15 Insider Trading Securities Fraud (Counts Two through Nine) and Title 15 Tender Offer Fraud (Counts Seventeen through Twenty-Four) Charges Are Not Multiplicitous

Markin conflates the elements the Government would have to prove to meet its burden as to the Title 15 tender offer fraud counts with the elements the Government would have to prove to meet its burden as to the Title 15 insider trading securities fraud counts. (*See* Dkt. 44 at 16.) Applying the *Blockburger* test, the elements of the Title 15 insider trading securities fraud counts and the Title 15 tender offer fraud counts are not multiplicitous because there is at least one element in each offense that is not contained in the other. *Blockburger*, 284 U.S. at 304.

To be guilty of securities fraud under Title 15, a defendant must knowingly, willfully, and with intent to defraud engage in insider trading in connection with the purchase or sale of a security on a national exchange. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Pursuant to Section 78j(b)

of Title 15, a defendant engages in insider trading through misappropriation when he (1) owed a duty of trust and confidence to a source of information; (2) violated that duty of trust and confidence by taking material non-public information from the source to trade securities, or by disclosing material non-public information to another person that the defendant expected would use the information to trade and did in fact trade securities; and (3) in using or providing this information, the defendant expected to receive a personal benefit. *See United States v. Chow*, 993 F.3d 125, 135 (2d Cir. 2021); Jury Charge, *United States v. Lavidas*, No. 19 Cr. 716 (DLC) (Jan. 14, 2020); Jury Charge, *United States v. Pinto-Thomas*, No. 15 Cr. 579 (JSR) (Apr. 16, 2019).

Tender offer fraud, on the other hand, requires proof of several elements not required of Title 15 insider trading securities fraud, and at the same time, does not require breach of a fiduciary duty for a personal benefit. 15 U.S.C. § 78n(e). Indeed, one of the purposes of Section 14(e) was to address trading based on non-public information about a tender offer where establishing knowledge of a breach of a duty is often difficult to prove. *United States v. O'Hagan*, 521 U.S. 642, 674 (1997). Thus, unlike Title 15 securities fraud, Section 14(e) and SEC Rule 14e-3(a), provide that a person violates Section 14(e) if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows . . . has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf." *United States v. Chestman*, 947 F.2d 551, 557 (2d Cir. 1991); *see also United States v. O'Hagan*, 521 U.S. 642, 669 (1997) (quoting *Chestman*'s description of the Rule). In other words, because tender offer fraud imposes liability on a trader "without regard to whether the trader owes a pre-existing fiduciary duty to respect the confidentiality of the information," *O'Hagan*, 521 U.S. at 669 (quoting *Chestman*, 947 F.2d at 557), tender offer fraud does not contain the violation-of-a-duty element required by Title 15 insider trading securities fraud.

Likewise, there are several elements of tender offer fraud that need not be proven for a defendant to be guilty of Title 15 insider trading securities fraud. For instance, to be guilty of tender offer fraud, the defendant must have traded on or communicated to another person non-public information that he knew had been acquired directly or indirectly from an insider of the offeror or issuer, defined by Rule 14e-3, or someone working on their behalf. *See* Jury Charge, *United States of America v. Sean Stewart*, 15 Cr. 287 (JSR) (Sept. 17, 2019). There is no requirement that information come from an insider of the offeror or issuer under Title 15 insider trading securities fraud. Additionally, to be guilty of tender offer fraud, the defendant must have traded or made the communication at a time when the offeror had taken a substantial step or steps to commence the tender offer. *Id.* Again, no such requirement exists for insider trading under Title 15. In fact, the only element of tender offer fraud that tracks an element of Title 15 insider trading is the general willfulness *mens rea* requirement.

### C. The Title 18 Securities Fraud Charge (Count Sixteen) is Not Multiplicitous of the Title 15 Insider Trading Securities Fraud Charges or the Title 15 Tender Offer Fraud Charges

Applying the *Blockburger* test once again, the elements of Count Sixteen, which charges Title 18 securities fraud, is not multiplicitous of the Title 15 insider trading securities fraud counts or the Title 15 tender offer fraud counts because there is at least one element in Count Sixteen that is not contained in those charges. *Blockburger*, 284 U.S. at 304.

To be guilty of insider trading under Title 18, a defendant must knowingly and with intent to defraud participate in the execution of a scheme to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises in connection with the purchase or sale of stock. 18 U.S.C. § 1348. A defendant participates in such a scheme when he embezzles or converts confidential information belonging to another by taking the information and

converting it to his own use, or the use of another person, for the purpose of buying or selling securities on the basis of that information. *See* Jury Charge, *United States v. Blaszczak*, No. 17 Cr. 357 (LAK) (Apr. 27, 2018); Jury Charge, *United States v. Lavidas*, No. 19 Cr. 716 (DLC) (Jan. 14, 2020).

Unlike Title 15 insider trading securities fraud or Title 15 tender offer fraud, insider trading under Title 18 requires proving that the defendant participated in the execution of a scheme to defraud or a scheme or artifice to obtain money or property by materially false and fraudulent pretenses, representations or promises in connection with the purchase or sale of stock. Title 15 insider trading securities fraud also requires proof of at least one element not required to prove Title 18 insider trading. For example, a Title 15 insider trading securities fraud charge requires the Government to prove that the defendant, in using or providing the confidential information, expected to receive a personal benefit. Likewise, Title 15 tender offer fraud requires proof of at least one element not required to prove Title 18 insider trading. For example, a Title 15 tender offer fraud charge requires the Government to prove that the defendant (1) traded on the basis of material non-public information relating to a tender offer, which the defendant knew had been acquired directly or indirectly from an insider of the offeror or issuer, and (2) the defendant traded at a time when a substantial step had been taken to commence the tender offer. Neither of these elements required to prove insider trading under 18 U.S.C. § 1348.

Markin's apparent emphasis on the proof of his conduct as described in the Indictment, *see* Dkt. 44 at 13 to 14, is also misplaced. The test is applied to the statutory definition, not to the proof in a particular case. *See United States v. Ferguson*, 478 F. Supp. 2d 220, 234 (D. Conn. 2007) ("Blockburger focuses on the means by which the elements of the crime could possibly be satisfied, not the proof the government will offer at trial for each charge."). "[T]he Court's

application of the test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Albernaz*, 450 U.S. at 338 (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n. 17 (1975)); *United States v. Biasucci*, 786 F.2d 504, 515 (2d Cir. 1986) ("If each *statute* requires proof of a fact that the other does not, the Blockburger test is satisfied, even if the same proof is used at trial to establish both crimes." (emphasis in original)); *United States v. Langella*, 776 F.2d 1078, 1082 (2d Cir. 1985) ("[defendant's] argument based on *Blockburger* would fail even if both convictions were founded on identical conduct. . . . *Albernaz* requires us to focus on the provisions of the statutes involved, rather than on the evidence adduced at trial, to determine whether the punishment appellant received was proper under *Blockburger*."); *see also Woodward*, 469 U.S. at 108 (holding that two statutes were distinct under the *Blockburger* test because proof of one offense did not in all cases "necessarily" include proof of the other).

Applying the *Blockburger* test to the charges in the Indictment, and not to the conduct described or the expected trial proof, it is clear that the statutes at issue all "require proof of a fact which the other[s] do[] not." *Albernaz*, 450 U.S. at 338. Since each of these crimes can be proven without necessarily establishing the other, they are separate offenses under *Blockburger*, and the defendant's motion should be denied.

### D. Dismissal Would be Premature

Even if the Title 15 insider trading securities fraud charges, the Title 15 tender offer fraud charges, and the Title 18 securities fraud charges could be deemed potentially multiplicitous, Markin's motion to dismiss at the pretrial stage on this ground is premature and should be denied. *See United States v. Halkbank*, No. 15 CR. 867 (RMB), 2020 WL 5849512, at *9 (S.D.N.Y. Oct. 1, 2020), *aff'd sub nom. United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021)

("Courts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature.").

As explained in *United States v. Gupta*, "neither of the two reasons for consolidating or dismissing multiplicitous counts applies at this juncture." No. 11 CR 907 JSR, 2012 WL 1066804, at *2 (S.D.N.Y. Mar. 27, 2012). Dismissal of multiplicitous counts is appropriate where (1) "charging multiple counts for the same offense may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes" or (2) "because the Double Jeopardy Clause of the Fifth Amendment forbids punishing a defendant twice for committing the same offense." *Id.* (internal quotation marks omitted). The first circumstance will not apply if this Court does not read or send the indictment to the jury, and counsel will have no reason to enumerate the counts in their opening, and no potential for prejudice will conceivably arise until much later in the trial, at which time the Court will have a more fulsome evidentiary basis to evaluate the claim of multiplicity. *See id.* As for punishment, that Double Jeopardy concern "arises only at sentencing and is not something the Court need take heed of at this pre-trial stage." *Id.* (citing *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006)).

## CONCLUSION

Accordingly, the Government respectfully requests that the Court deny Markin's pretrial motions.

Dated:  New York, New York
        February 6, 2023                           Respectfully submitted,

                                                   DAMIAN WILLIAMS
                                                   United States Attorney

                                             By: _____/s_____
                                                   Negar Tekeei
                                                   Nicolas Roos
                                                   Kiersten Fletcher
                                                   Assistant United States Attorneys

25