UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

UNITED STATES OF AMERICA


        -against-                22 Cr. 395 (ER)


JONATHAN BECKER,

                Defendant.

------------------------------------------------------------- X


## **SENTENCING MEMORANDUM OF JONATHAN BECKER**

MORVILLO LLP
1740 Broadway, 15th Fl.
New York, New York 10019
Tel: (646) 831-1531

*Attorneys for Defendant Jonathan Becker*

# I. PRELIMINARY STATEMENT

Jonathan Becker respectfully submits this memorandum in advance of his sentencing. Mr. Becker submits that when the Court considers all of the relevant facts—including his lack of a criminal record, his post-offense conduct ███████████████████████████ ████████, and the very low chance of recidivism—it should impose a non-custodial sentence. A sentence, in the range of time served or a short period of home confinement, will serve the goals set forth in 18 U.S.C. Section 3553(a).

Mr. Becker is a hardworking and honest man. The offense conduct does not represent who he truly is as a person. The letters submitted by Mr. Becker's family and friends paint the picture of a caring young man who has genuine remorse for this conduct. <u>See</u> Exhibit A. Before the instant case, he had never had any interaction with law enforcement. After a series of personal hardships, Jon pursued a career as a licensed elevator mechanic.

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████████████

███████████████████████████████

Mr. Becker respectfully requests that the Court impose a sentence that incorporates the maximum amount of leniency possible – only then will the result be "sufficient but not greater than necessary," to meet all of the sentencing goals embodied in 18 U.S.C. § 3553(a).

## II.    BACKGROUND

### A.    Jonathan Becker's Personal History

Jonathan Becker grew up in Rockland County, New York. While he came from a middle-class in-tact family, emotional turmoil within the home created a difficult environment. The situation is detailed in the PSR, and out of respect for the parties' privacy, will not be repeated here. See PSR at ¶ 48.

Mr. Becker has a strong work ethic and has been employed in some capacity since he was 13 years old. See id. at ¶¶ 74 – 82. Since junior high school, Jon had been interested in a career in law enforcement. In high school, he joined the Clarkstown Youth Police Academy. See id. at ¶ 69. Jon also took the Emergency Medical Technician (EMT) training course and volunteered as an EMT in New City, New York for one year. After graduating high school, Jon attended State University of New York at Plattsburg. Knowing he wanted to be in law enforcement, Jon *never* experimented with any drugs (including marijuana) as a teenager or while in college. When he was a junior in college, he took the New York City Police Department written exam and scored a 95 (out of 100). See id. at ¶ 70. Jon graduated from college in May 2011. Later that year, he began the official process of applying to become a police officer with the NYPD. See id. As part of the process, he was interviewed by a psychologist. Despite passing on all fronts, he was denied acceptance by the NYPD due to a finding of risk of alcohol abuse.[1]

While Jon was crushed by the decision, he did not let the NYPD's rejection deter him from pursuing a career in law enforcement. He applied to the New York State Troopers. See id. at ¶ 71. He was, however, handed another rejection when he was told that he failed the polygraph

---

[1] Jon was shocked by the decision and felt it was entirely unfounded. He has never been an excessive drinker and did not understand the NYPD's decision. With the help of his father, Jon appealed the denial to the Civil Service Commission, and testified at a trial. Despite there being zero evidence of alcohol abuse, the NYPD's decision was upheld. See PSR at ¶ 71.

when asked about his drug use. Jon was again shocked by the decision as he had *never* used illegal drugs, as stated above, even including marijuana. <u>See</u> <u>id</u>. He then applied to the Clarkstown Police Department, but ultimately withdrew his application because he did not want to face unwarranted rejection for a third time. <u>See</u> <u>id</u>.

Jon worked a series of dead-end jobs after being dealt these set-backs. <u>See</u> <u>id</u>. at ¶¶ 75-79. Jon used his proficiency for physical fitness to become a personal trainer. He enjoyed the work and liked working with people, but ultimately felt it was not a sustainable career that challenged him in the way he wanted. In 2015, one of his clients offered him a job at an elevator repair company, TEI Group. <u>See</u> <u>id</u>. at ¶ 74. Jon liked the idea of making the change and accepted the entry level position. He initially started in the parts department as a delivery driver. <u>See</u> <u>id</u>. In 2016, he gained admission into the Union, and began his apprenticeship as an elevator repairman. <u>See</u> <u>id</u>. In 2021, Jon passed the mechanics exam and obtained his elevator mechanic's license as required by NYC's Department of Buildings. <u>See</u> <u>id</u>. Since then, Jon has been working for the same company. He is unclear whether the company will permit him to keep his job with a felony conviction and, even if it does, he does not know if there will be work for him should he receive an incarcertory sentence.

For his entire life, Jon prided himself on being athletic and healthy, even parlaying that joy into working as a physical trainer. However, in 2018, he began to suffer from chronic pain. <u>See</u> PSR at ¶ 59. The pain started as bilateral shoulder pain. By the summer of 2018, the pain spread throughout his body and became difficult for him to walk, he could not raise his arms for more than a few seconds and he could not tie his shoes or write his name without his hands cramping. The pain became so severe that Jon was unable to work. He visited numerous doctors – a rheumatologist, two different neurologists, a cardiologist, an orthopedist, as well as physical

therapists. It frustrated Jon to no end because the doctors were unable to diagnose him. Jon continued with physical therapy, which did not help with the pain, but slowly helped him get some normalcy back to his body. Jon is still not 100% but ultimately returned to work.

While in college, Jon became interested in the stock market. He traded sporadically and mostly purchased stocks he was familiar with – Verizon, General Electric, and the like. In 2019, he began watching videos on the internet about the stock market and came across a course called Clay Trader. Clay Trader teaches individuals how to trade stocks based on technical analysis, such as how a particular stock is trending or the movement of a stock over a particular time period. Jon enjoyed the technical analysis aspect and started trading daily.

In 2020 and 2021, during the COVID-19 pandemic, he had some success day trading. During this period, he engaged in thousands of trades in his account. As he made more money, the size of his positions increased. It was not unusual for him to take a position similar in size to the one he took in this case. For example, He purchased significant positions in Gamestop, Marathon Digital Holdings, Moderna Inc., Palantir Technologies Inc., Porch Group Inc., and more. He also shorted large quantities of certain equities e.g., Amazon, Bionano Genomics, Boeing, Churchill Capital Corp., and more. Jon was an active trader and took large positions where his account permitted.

### B.    Letters of Support

Friends and family did not hesitate to take the opportunity to write letters in support of Jon Becker. The letters share several common themes: Jon is hard-working, of great character and a caring individual. As a longtime friend and sergeant in the Suffolk County Police Department writes: "[I]t was apparent that [Jon's] primary focus was [] his desire to achieve personal and career success and that physical fitness and travel were his hobbies. I cannot recall

a time that I believed Jon to be engaging in anything that wasn't positive and productive in achieving things in his life. Jon always seemed to concentrate on meaningful activities rather than having any vices." Exhibit A at 1, letter of Matthew Sullivan; see id. at 6, Letter of Julian Gialanella ("Jon is someone I have and still do rely on through these years as a friend and someone I can always count on, no matter the situation."); id. at 4, Letter of Robert Becker ("It seems a difficult task to describe in the confines of this letter, just what a wonderful human being Jon is, someone we are tremendously proud to have as a son. I am confident that all who know Jon can attest to his strong character and work ethic.").

Jon has been an integral part of his extended family, caring for those in need. His aunt writes about when her husband, fighting pancreatic cancer, started suffering physically: "Jon came to my home several times, stayed with us for a few days during his 'vacation' to help his uncle get around more easily, talk with him, and do heavier house chores that neither of us could do. He intuitively offered to do these things without being asked." Id. at 2, letter of Susan Rausch. Jon's grandmother writes in her letter: "He is always generous with his time and energy to be of help. Now that I'm in Florida, he comes to visit even though he has had limited vacation time. He'll help me with things here, but also spend the day with me playing miniature golf or driving us to the beach. He is very compassionate and makes me feel capable. He is always kind and caring for me and will go out of his way to help strangers too. Once he is back home, he calls me weekly just to talk. I greatly look forward to his phone calls." Id. at 5, letter of Zelda Becker.

Jon has also expressed remorse for his conduct in the instant case. See Id. at 1, letter of Matthew Sullivan ("I have no doubt that this case has effected Jon immensely and he has learned that his conduct was wrongful. I do not know Jon to be someone who consciously

chooses to do the wrong thing and to see if he can get away with the benefit of it. I know Jon to choose the right thing."); id. at 2, letter of Susan Rausch ("I am certain, because I know his character and what he has voiced, that he has regrets and will in the future be a positive contributor at his job, to society and to those friends and family who love him. We will always support him."); id. at 4. ("Jon has been remorseful about the crime he has pleaded guilty to. He has had no association with his former friend and apartment mate who involved him and will not."); id. at 7 letter of Julian Gialanella ("It is heart breaking. I can't imagine my good friend Jon, being in this situation. I do know he is regretful, as one would expect at this juncture.").

### C. The Offense Conduct

In or around February 14, 2021, Mr. Becker's former roommate volunteered that the roommate's cousin reported that "good news" was coming about a particular company and that its stock price was going to "triple." Mr. Becker asked how his roommate's cousin knew this information and his roommate explained it was because of the cousin's job at the Department of Defense (that turned out to not be true). At the time, Mr. Becker was not sure about the accuracy of the information, but nonetheless purchased stock in the company on February 16, 2021.

After he purchased the stock, Mr. Becker asked his roommate to confirm that the cousin had accurate information. Mr. Becker was concerned about trading on potentially false information and wanted some sort of confirmation.[2] Mr. Becker never asked his roommate if

---

[2] According to the complaint filed by the Securities and Exchange Commission, on February 16, 2021, Mr. Becker messaged his roommate: "Wow. [The stock] is really taking off . . . How does he know when news will release?" Becker's roommate said he did not have that answer and Becker responded: "I will give you $10,000 if you can get your cousin to say he is 100% certain he has insider info that news is coming out which will send the stock up." Mr. Becker made this offer to pay his roommate half-jokingly in an effort to get his roommate to acquire more information to confirm the accuracy of the information. And, while Mr. Becker used the phrase "inside info[rmation]," he did not use that term in the legal sense (e.g., that the information was

what they were doing was illegal. At one point in time, Mr. Becker's roommate did state that his cousin had told him not to share the information with anyone.

Over the next week or so, Mr. Becker's roommate provided small updates relating to the timing of the "good news," but he never provided any specifics or additional information. While continuing to press his roommate to confirm the accuracy of the information, Mr. Becker purchased more shares of stock. On February 26, 2021, an announcement was made that the company was being acquired by a larger company and the stock increased in value.

Mr. Becker was aware of red flags that the information might have been obtained improperly but intentionally did not ask further questions. Despite the red flags, Jon purchased the stock anyway.

██  ████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████

██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

_____

███████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████

████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████

**E.**     **The Plea Agreement and Guidelines Calculation**

On September 20, 2023, ████████████████████████████████████ Mr. Becker waived indictment as well as the production of any discovery, and pleaded guilty pursuant to a plea agreement. He pled to a one count superseding Information, that charged him with securities fraud, in violation of 15 U.S.C. Sections 78j(b) & 78ff, 17 C.F.R. Sections 240.10b-5, 240.10b5-1, and 240.10b5-2, and 18 U.S.C. Section 2.

At his plea proceeding, Mr. Becker allocuted his guilt as follows:

> In and around February 2021, I spoke to my former roommate Phil Marken who told me that his relative had information about a company called Pandion, that was material and nonpublic.
>
> He passed this information to me and told me that his relative got the information through his job - although that turned out not to be true.
>
> I believe that Markin was trying to benefit me by providing this information expecting me to trade.

> I was aware of red flags that the information might have been obtained improperly but did not ask further questions because I did not want to know.
>
> Despite the red flags I bought stock anyway.
>
> I am very sorry for my conduct.

Pursuant to the parties' plea agreement, the advisory Guidelines range is as follows:

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2B1.4(a) | 8 |
| Specific Offense Characteristic, foreseeable gain was more than $250,000 but less than $550,000, U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(G) | +12 |
| Adjustment for Certain Zero-Point Offenders, U.S.S.G. § 4C1.1(a) | -2 |
| Acceptance of responsibility, U.S.S.G. §§ 3E1.1(a), (b) | -3 |
| Total offense level | 15 |

Mr. Becker has no prior criminal history, and therefore, has a criminal history category of I. Accordingly, the applicable advisory Guidelines range is 18 - 24 months.

As part of his plea agreement, Mr. Becker has agreed to the entry of a forfeiture money judgment in the amount of $266,859.

After pleading guilty, Mr. Becker was released on his own recognizance without any pretrial conditions.

## III.     ARGUMENT

### A.     The Applicable Legal Standard

It is axiomatic that as part of sentencing courts must consider every "convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 562 U.S. 476, 487 (2011) (quoting Koon v. United States, 518 U.S. 81, 113 (1996)). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." Pepper, 562 U.S. at 487–88 (internal quotations and citation omitted); see also Genao, 869 F.3d at 146; United States v. Jones, 531 F.3d 163, 170 (2d Cir. 2008) (en banc).

Section 3553(a) of Title 18 of the United States Code provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." 18 U.S.C. §3553(a). As the Court well knows, it has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Genao, 869 F.3d 136, 146 (2d Cir. 2017). "The Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008). After considering all of the §3553(a) factors, the Court should decide whether to "impose . . . a sentence within the applicable Guidelines range or within permissible departure authority," or "to impose a non-Guidelines sentence." United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005), abrogated on other grounds by United States v. Fagans, 406 F.3d 138 (2d Cir. 2005). It is thus appropriate for courts to sentence defendants below the Guidelines range when such a sentence satisfies the purposes of 18 U.S.C. § 3553(a).

In Rita v. United States, the Supreme Court summarized the § 3553(a) factors that a sentencing court should consider: the "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the

Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid

unwarranted disparities; and (7) the need for restitution." 551 U.S. 338, 347–48 (2007).



██████████████████████████████████████████████

████████████████████████████████████████████

███████████

██████████████████████████████████████

█████████████████████████████████

**C.**        **The Section 3553(a) Factors Support a Non-Custodial Sentence**

       **1.**        **Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

Mr. Becker respectfully submits that the nature and circumstances of the offense as well as his history and personal characteristics all counsel in favor of a non-custodial sentence. <u>See</u> 18 U.S.C. § 3553(a)(1).

While guilty of insider trading, Mr. Becker traded based on information he had received without actual knowledge that it was material, non-public information obtained in breach of a fiduciary duty. He did not receive the information as someone in a position of power or trust. Nor did Mr. Becker seek the initial information. Instead, his roommate shared with him the fact that the roommate's cousin revealed "good news" was coming about a company and that the stock price of a company was going to "triple". Notably, Mr. Becker did not actually know from where or how his roommate's cousin obtained the information. Even when he sought confirmation of the information, he did not learn much more and never knew the actual source of the information. At certain times during the process, Mr. Becker was suspicious of the information, and he consciously avoided learning the truth about the source of the information.

       **2.**        **Section 2B1.1 of the Guidelines Overstate the Offense Conduct**

The gain in this case primarily drives Mr. Becker's Guidelines calculation. The monetary amount in this case sets the Guidelines calculation at 18 – 24 months of imprisonment. To be

sure, Mr. Becker agreed to this amount for the purpose of calculating the Guidelines as part of his plea agreement. But there are considerations about the dollar amount's importance to the Guidelines calculation that Mr. Becker respectfully submits that the Court should examine and, as a result, contemplate leniency in this matter.

The Guidelines measure only money without differentiating culpability among defendants or uncharged parties who contributed to the conduct. Courts have agreed that, in financial fraud cases, the Guidelines place an "inordinate emphasis" on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). The Guidelines' "arithmetic approach" is particularly ill-suited in cases where the calculated loss is often arbitrary and attenuated from the defendant's actual conduct. Id. at 512. Indeed, judges in this circuit have described the loss calculation as a "clumsy tool for measuring [...] the seriousness of the crime." United States v. Contorinis, 09-cr-1083 (S.D.N.Y. 2010), Sentencing Tr. at 58:1-6; see also United States v. Whitman, 12-cr-125 (S.D.N.Y. 2012), Sentencing Tr. at 9:9-18 ("the guidelines . . . place too much emphasis, irrational emphasis on the monetary portion of the determination of sentence . . . [t]he guidelines are skewed irrationally in this respect.").

The reliance on loss or foreseeable gain in the Guidelines calculation could lead to sentences that unfairly magnify the defendant's actual conduct. For instance, a large foreseeable gain ignores minor roles in offenses and certainly comparatively small personal gain. Attaching a defendant's sentence to the size of profits could lead to egregious conduct being punished less severely than aberrant or minimal conduct from a qualitative perspective.

In the instant case, Mr. Becker is a third level tippee. He received information not from the source, but from someone else. He was never told the truth – that the source had looked through his lawyer girlfriend's confidential work documents without her permission and learned about the acquisition. Instead, Mr. Becker was told a different version of events, parts of which turned out to be false, that the roommate's cousin learned the information through work. Furthermore, Mr. Becker did not profit the most among the tippees. Another tippee made more than $1.3 million in net profits from the trading and was held accountable for $2,031,821 in proceeds received from the trades. See PSR at ¶ 19. One already sentenced defendant, who received a non-incarcerative sentence, made approximately $400,000 in profits. Mr. Becker made $266,859 in proceeds. See id. at ¶ 22.

While Mr. Becker agreed to the gain amount for Guidelines purposes here, the emphasis on a dollar amount in driving the Guidelines calculation should be viewed with some skepticism in light of all the Section 3553(a) factors. As one court in this circuit observed in another financial fraud case, "the guidelines fetish with the calculation of loss poorly fits this situation." United States v. Fleishman, 10-cr-752 (S.D.N.Y.), Dec. 20, 2011 Sentencing Tr. at 4:18-20.

As to the history and characteristics of Mr. Becker, his participation in the offense conduct is not the sum total of his life. Indeed, he has led an otherwise quiet, hard-working, and law-abiding life. He does not live a lavish lifestyle. As he told Probation, he "was always frugal and saved his money as he wanted to buy a house." Id. He lived with three roommates in order to save for the future. Mr. Becker was not a big spender and never purchased expensive items. The

instant offense has depleted his savings.[3] As such, he no longer has a "nest egg" saved for his future. PSR at ¶ 55.

### 3. Mr. Becker's Conduct is Aberrant in the Context of His Life

Mr. Becker respectfully submits that his offense conduct represents an aberration in the context of his life. There is no doubt that Mr. Becker has led his life with integrity, strength of character, and a commitment to overcoming his own personal hardships. See Exhibit A. Mr. Becker has never before been involved in criminal behavior. And it is very unlikely that he would ever again break the law. This is a significant factor in the sum total of Mr. Becker's life.

The fairest view of the circumstances of this case supports the characterization of Mr. Becker's conduct as aberrant in the "uncharacteristic" meaning of the word. In recommending a sentence in a high-profile case in the Southern District of New York, Judge Rakoff found that the "instant offenses were aberrant behavior—not aberrant as defined by the Sentencing Guidelines, but rather as defined by Merriam-Webster: . . . Atypical." United States v. Gupta, 11-cr-907 (S.D.N.Y. 2012), Sentencing Tr. at 53:15-18.

Mr. Becker respectfully submits that the same is true here. First, it is clear that Mr. Becker did not initially seek out the information. Second, the PSR details Mr. Becker's otherwise law-abiding and hard-working life. Mr. Becker has been with his current employer for the last eight years, and he hopes to remain in that job (something that is in doubt if he receives an incarcerative sentence). He started as a delivery driver and was quickly promoted to apprentice. He was thereafter accepted by the Union and became a licensed elevator mechanic. This progression typifies Mr. Beckers life and is the truest indication of Mr. Becker's character. He is

---

[3] Prior to retaining the undersigned, Mr. Becker spent a significant amount of his savings on pre-arrest legal fees. See PSR at ¶ 55.

a very hard-working, dedicated man – he is not simply someone who can only be described as an person who exercised poor judgment while making a trade.

There is no question that his conduct was "atypical" in light of Mr. Becker's history of hard work and accomplishments. Until now, Mr. Becker has had an unblemished life and demonstrated that he was a man of high character and trust. The Court, thus, should not consider the conduct associated with this case to be the sum total of Mr. Becker's life—it is the Jonathan Becker from his childhood through today who should be weighed and measured. Mr. Becker is "so much more than just the black dot" of his conviction; "there [is] an entire page full of white unblemished by any mark." United States v. Kimelman, No. 10-cr-56, Oct. 10, 2011 Sentencing Tr. at 10:1-19. Accordingly, Mr. Becker respectfully requests that the Court consider the otherwise unblemished, and indeed superlative, record of his life and career in its entirety when fashioning a just and appropriate sentence.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

Title 18 U.S.C. § 3553(a)(6) describes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A non-custodial sentence would be consistent with the other sentence so far imposed in this case.

Brian Wong, the brother of Brandon Wong who had received the tip directly from the source, pleaded guilty to accessory after the fact to conspiracy to commit securities fraud and tender offer fraud, pursuant to 18 U.S.C. Section 3. After receiving the tip from his brother, Brian Wong, "a bank employee who tried to hide his trading activity by using brokerage accounts opened in his name of his domestic partner, then purchased thousands of shares of Pandion, and also told several of his friends to purchase Pandion shares." Government's

sentencing submission at ECF # 65, at 4. "[T] defendant sold his shares of Pandion for more than $400,000 in profits … and also deleted certain of the Text Messages between himself and his brother, Brandon Wong." Id. Notably, when interviewed by the FBI, Brian Wong lied to the agent and told them he was not familiar with Pandion, his brother did not tell him anything about Pandion, and that he himself did not discuss Pandion with anyone else." Id. at 4-5. The Court sentenced Brain Wong to three years' Probation with the six months home confinement. See PSR at ¶6.

Mr. Becker's offense conduct is no more serious than Brain Wong's. Indeed, it is less egregious. Unlike Brian Wong, Mr. Becker never lied to the FBI ████████████████████ ████████████████████████████. Mr. Wong's profits exceeded Mr. Becker's by approximately $150,000. Brian Wong, as noted above, tried to hide his trades by trading under his domestic partner's name. Mr. Becker did not. Both men informed others about the information. Both men deleted communications (Mr. Becker was told by his roommate/tipper to delete communications about the information and Mr. Becker did). Mr. Wong was much closer to the source of the information than was Mr. Becker.

Mr. Becker and Brian Wong are similarly situated in relation to the conduct in this matter. Indeed, Mr. Becker is further down along the tipping chain, made less money, did not lie to the government, ██████████████████████, which it is respectfully submitted makes him more worthy of leniency in this case. In order to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, a non-custodial sentence for Mr. Becker is appropriate.

In addition, other individuals convicted of insider trading in the Second Circuit, sometimes with greater profits than Mr. Becker, have received non-incarceratory sentences. For

example, in <u>United States v. Stewart</u>, No. 15-cr-287 (S.D.N.Y. May 4, 2016) the defendant traded on five separate deals and generated over one million dollars in profit. The court sentenced the defendant to four years of probation. In <u>United States v. Tsai</u>, No. 19-cr-675 (S.D.N.Y. Jan. 17, 2020), the court handed down a sentence of five years of probation to an employee who stole information from his employer. In <u>United States v. Peltz</u>, 21-cr-154, the court sentenced the defendant to five years' probation where he made $1.1 million in illicit profits. These are but a few of the many examples of courts in this circuit granting non-incarcerative sentences in insider trading matters.

Furthermore, the Court can factor into its sentencing analysis others who knew the same information, traded, and yet went uncharged and therefore unpunished. In the instant case, the government has not charged the FBI agent who profited from the receipt of the same information he received from Mr. Becker. The Court can consider this as a sentencing disparity too.

Mr. Becker respectfully submits that he is similarly situated to all of the aforementioned individuals, albeit with lesser profits and ███████████████████ Thus, he respectfully submits that the Court should consider avoiding disparate sentences between similarly situated defendants, both related to and unrelated to the instant matter, by granting Mr. Becker a sentence that does not contemplate incarceration.

### 5. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment

Subsection (2)(A) of Section 3553 provides that the Court should consider the need for the sentence it imposes "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553 (a)(2)(A). This section of the Code essentially asks the Court to consider the defendant and his actions holistically, and to "provide just punishment" in light of all the facts known to the Court. <u>Id</u>.

While Mr. Becker in no way seeks to diminish his criminal conduct, in assessing the sentence to reflect the seriousness of the conduct, it is respectfully submitted that his conscious avoidance takes this case outside of the heartland insider trading case where an individual knowingly receives or purposefully steals material, non-public information and trades on it. Instead, Mr. Becker committed insider trading on the basis of not doing enough to determine the source of the information. Plainly stated, this is not a case where the conduct itself screams out for the imposition of a prison term.

Accordingly, it is respectfully submitted that a non-custodial sentence, coupled with a federal felony forever on Mr. Becker's record, the mandated forfeiture and a period of supervised release, is sufficient to satisfy all of the goals of sentencing. Such a sentence will certainly promote respect for the law and provide just punishment. Cf. Gall v. United States, 128 S. Ct. 586, 595-96 (2007) (noting that a probationary sentence imposes a significant restraint on the liberty of a defendant).

## 6. Deterrence

Another factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B) & (C). The first factor contemplates generally deterring the public from committing crimes similar in nature to those in which the defendant has engaged. The second focuses on deterring the defendant himself from committing future crimes. Mr. Becker submits that both general and specific deterrence have been adequately met in this case.

For a sentence to accomplish general deterrence, it must work as a message to the entire community of potential violators. There is, however, "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."

United States v. Adelson, 441 F. Supp. 2d, 506, 514 (S.D.N.Y. 2006) (internal citation omitted); see also United States v. Yeaman, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J. dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes.").

In the instant case, general deterrence has been satisfied. Mr. Becker has been charged with a crime and has entered a guilty plea. He will be ordered to pay a forfeiture judgment in the amount of $266,859. A criminal felony conviction for securities fraud, combined with a forfeiture order and a period of supervised release, whether inclusive of a brief period of home confinement or not, will encourage the general public not to participate in similar crimes. There is no further general deterrence[4] achieved by incarcerating Mr. Becker.

Section 3553(a)(2)(C) focuses on specific deterrence of further criminal conduct by the defendant himself. It requires the Court to consider the need "to protect the public from further crimes of the defendant." Here, there is no need for incarceration to achieve specific deterrence for Mr. Becker. The day the FBI showed up at his door was the worst day in his life. The mental and emotional toll this case has taken on the defendant is indescribable. The despair he has felt over the last several years is substantial. As he told Probation "due to the charges he initially felt

---

[4] In addition, the efficacy of harsh sentences as "general deterrents" is questionable. Social science appears to undermine the notion that prison sentences will deter others from committing similar crimes. See Amy Baron-Evans, Sentencing by the Statute, pp. 7-9 (April 27, 2009, revised Dec. 21, 2010) ("…potential criminals … do not believe [that] they will be apprehended and convicted," and therefore, they do not "consider sentence consequences in the manner one might expect of rational decision makers") (citing Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A review of Research 28-19 (2006)), a copy of Ms. Baron-Evan's article can be found at https://nyn.fd.org/content/sentencing-statute-amy-baron-evans-2009. Because there is no evidence to suggest that sentencing Mr. Becker to a period of incarceration will lead to a reduction of crime through general deterrence, it is respectfully submitted that time served or a period of home confinement is "sufficient, but not greater than necessary" to achieve the statutory goals of deterrence.

the most upset he has ever been knowing and hearing what could happen as a result of committing the instant offense, but he has since accepted it. He stated that it has been very difficult, and he certainly had some hard days where he would miss work because he could not sleep and would be up thinking about the instant offense." PSR at ¶ 62. Mr. Becker also informed Probation that "he cut himself off from his friends due to the charges as he felt isolated." Id. He has attended a few therapy sessions to work through his stress and feeling of despair, but ultimately found the sessions unhelpful. Based on his experience here, ████████ ████████████████████████████, the fear that he has lived with since the FBI visit, and based on the forfeiture Mr. Becker will have to pay, it is very unlikely that he will ever run afoul of the law again.

Courts have routinely recognized that below-Guidelines sentences achieve the appropriate deterrent effect where a defendant's Guidelines range significantly exceeds any prior term of incarceration. See United States v. Green, 04 Cr-424, 2006 WL 3478340, *6 (S.D.N.Y. Dec. 1, 2006) (finding that a term of 84 months, rather than the 188-235 month term recommended by the Guidelines, achieved the necessary deterrent effect for a defendant that had not previously been incarcerated for more than a year); United States v. Mishoe, 241 F.3d 214, 219-20 (2d Cir. 2001) (recognizing that a large disparity between a Guidelines sentence and the length of prior incarceration may indicate that the deterrent effect is excessive). This is because "[g]enerally, a lesser period of imprisonment is required to deter a defendant not previously subject to a lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend." United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). Although Mr. Becker has never before been incarcerated, the logic applies with equal, if not greater, force. The Court likely took this into account when sentencing Brian Wong

to a non-incarcerative sentence. Mr. Becker has been aware that he was under investigation since late 2021 and in the last 2.5 years, he has not engaged in any similar conduct. It is respectfully submitted that he does not require a custodial sentence to deter him from committing future crimes.

### 7. Mr. Becker's Post Offense Rehabilitation

Courts can take post-offense and/or potential for rehabilitation into account at sentencing. Mr. Becker respectfully urges the Court to do so here by imposing a sentence of time served or a brief period of home confinement. "[I]t is well established that a district court should consider a defendant's potential for rehabilitation in determining a sentence." United States v. Wong, 40 F.3d 1347, 1382 (2d Cir. 1994); see also United States v. Barton, 76 F.3d 499, 503 (2d Cir. 1996) ("A court may depart from the applicable guideline range in view of the defendant's efforts toward rehabilitation."). Courts in the Second Circuit have granted substantial leniency based on post-offense rehabilitation. See United States v. Blake, 89 F. Supp. 328, 339 (E.D.N.Y. 2000) (departing 21 offense levels "based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior."). Post-offense and/or potential for rehabilitation may also "shed light on the likelihood that . . . [a defendant] will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence." Pepper v. United States, 562 U.S. at 492.

The offense conduct occurred in February 2021. Mr. Becker has known law enforcement was investigating this case since late 2021. Since that time, Mr. Becker has had stable full-time employment and zero interactions with law enforcement. After pleading guilty, he was released on his own recognizance. All of this is relevant in determining whether a defendant is likely to continue post offense rehabilitation. See Pepper v. United States, 562 U.S. 476, 492 (2011) (recognizing that the defendant's model compliance with probation conditions, such as

his steady employment and recovery following successful completion of a drug free treatment plan, all "suggest[ed] a diminished need for . . . [further] correctional treatment"). Here, we submit Mr. Becker has shown that he will not reoffend.

### 8. The Need to Satisfy the Forfeiture Order

As the Court knows, Mr. Becker has consented to the entry of a money judgment in the amount of $266,859. In order to satisfy this hefty obligation, he will continue to work as much as possible, including working as much overtime as possible. Incarcerating him for any period of time will prohibit him from being able to pay his forfeiture in a timely manner.

## IV. CONCLUSION

For all the foregoing reasons, Jonathan Becker respectfully requests that the Court impose a sentence that contemplates a variance from the Guidelines in this matter based on his history and characteristics ███████████████████████████ lack of criminal history, the need to avoid unwarranted sentencing disparities, his post-offense rehabilitation, and the lack of need for specific or general deterrence.

Dated: New York, New York
December 5, 2023

/s/

_____
Gregory Morvillo, Esq.
Morvillo PLLC
1740 Broadway, 15th Floor
New York, NY 10019
Tel: (646) 831-1531
Email: gm@morvillopllc.com

*Attorney for Jonathan Becker*

# Exhibit A

Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007


Dear Judge Ramos,

     My name is Matthew Sullivan. I am 35 years of age and I am currently employed as a Sergeant in the Suffolk County Police Department in Long Island, NY where I also reside. I have been employed in law enforcement as a Police Officer and Sergeant for a cumulative term of over 10 years. Prior to my career in law enforcement, I studied Criminal Justice at SUNY Plattsburgh. In late August 2009, I met Jon Becker at SUNY Plattsburgh where we immediately became friends. My purpose for writing this letter is to provide you with my personal opinion of Jon Becker as well as my observations and judgement of his character. I respectfully request that you review and consider the input that I provide as you make your decision on Jon's sentencing.

     When I first met Jon at SUNY Plattsburgh, it was readily apparent that he and I were two individuals who did not fit in with the majority of the college crowd on campus. Jon and I were concerned with physical fitness, health and doing our best in class so that we could complete our degrees on time. Jon and I both expressed desire in becoming police officers one day and shared very similar moral convictions. While at SUNY Plattsburgh, Jon and I spent many days and nights at the gym, the library getting school work done or spending time with a Chinese foreign exchange student that we had befriended, where we would bring him out and have him try different American foods just for him to tell us how horrible he found it. Jon had always expressed a strong desire in succeeding in life and was not interested in being distracted by using alcohol or experimenting with drugs as many others did on campus. I personally looked at Jon as the only person on campus that I knew I could relate to, and I believe that he looked at me in the same way. Jon and I both maintained a reputation of being more "straight laced" than our other friends on campus and I relied upon him to be someone that did not follow along with the crowd and stayed grounded and focused.

     After college, Jon and I stayed in contact but saw each other rather infrequently due to the distance in which we lived from each other. When speaking with Jon, it was apparent that his primary focus was still his desire to achieve personal and career success and that physical fitness and travel were his hobbies. I cannot recall a time that I believed Jon to be engaging in anything that wasn't positive and productive in achieving things in his life. Jon always seemed to concentrate on meaningful activities rather than having any vices. Although we no longer saw each other often, I valued Jon as a person and asked him to be a groomsman in my wedding party in October 2018, which he accepted.

     For the last year or so, Jon and I have spoken less frequently as he has made it known he was going through some troubled times and dealing with the case at hand. Jon has not disclosed any intimate details of his case with me, but has given me very generalized information. During the times I have spoken with Jon, I have interpreted his vocal demeanor to be unhappy and that of someone who is expressing regret of making a bad decision and/or a bad mistake and is immensely disappointed with himself. In my opinion, I have no doubt that this case has effected Jon immensely and he has learned that his conduct was wrongful. I do not know Jon to be someone who consciously chooses to do the wrong thing and to see if he can get away with the benefit of it. I know Jon to choose the right thing.

     Your Honor, I again respectfully request that you to please review and consider what I have written about Jon during the sentencing procedure. Personally, I have very few people in my life that I consider a friend and that I would take the time to write a similar letter for. In the past, I have declined requests to write endorsements for friends seeking pistol licenses and I do not compose something of this important nature casually and I most definitely would not put my own character at risk by giving false or sensationalized information in effort to get a desired result. The words I have written to you are my honest assessment of my friend Jon Becker's character. I hope it aids in your decision.

Sincerely,

Matthew Sullivan

Re: Jon Becker

Dear Judge Ramos,

I, Susan Rausch, am happy to talk about my nephew Jon, my brother's son, who I have known his whole life. I grew up and went to college in New York, then moved to Michigan. I have thankfully kept in touch with Jon over the years and I retired in Florida. I worked as a manager for the Social Security Disability Program for over 30 years. I am now age 70.

I am not exaggerating when I say Jon is consistently one of the most kind, sweet, sensitive, thoughtful, bright and empathic people I know. Even in his early years in school and to this day, it is clear he was intelligent, athletically talented and truly a good person. I feel lucky to have him as part of our close knit family.

My husband Charlie recently passed away on 6/2/23 from pancreatic cancer. Jon was visiting his 96 year old grandmother in Florida a few months earlier when Charlie was getting very debilitated. It was a sad situation that most people try to avoid. However, Jon came to my home several times, stayed with us for a few days during his "vacation" to help his uncle get around more easily, talk with him, and do heavier house chores that neither of us could do. He intuitively offered to do these things without being asked. During this time, he and I talked a lot, we walked in a nature conservancy and had heart to heart talks about the challenges we both were confronting. His challenge is the charges he is facing and the impact this could have on his otherwise positive future. He spoke about how he was doing positive actions such as going to the gym, succeeding at work, and moving to a less hectic living situation by getting a small apartment for himself. We talked about strategies going forward. He is very bright and has worked hard all his adult life. Rather than going in a downward spiral with this first brush with the law, he works out at the gym, does yoga and has remarkably kept his head on straight. I sincerely believe he has done his best to take responsibility for his actions and deserves a chance to continue a bright future.

On 10/28/23, our daughter (his cousin), was married in Michigan and Jon took extra effort to attend the wedding and shared in the Air B&B  rental with his mother, father, brother(girlfriend) and grandmother and all got along well.  Again Jon's kindness showed through at the wedding. I never requested but Jon took a spot next to me during the ceremony. I started to cry due to my husband/ bride's father having died only months earlier. Jon again just knew how to calm me and rubbed my back which was a surprising but welcome sweet gesture that centered me back to the ceremony. He knew I needed support and gave of himself in the moment. That's just who he is.

Please consider giving this man the chance to come out of this in a lenient way. I am certain, because I know his character and what he has voiced, that he has regrets and will in the future be a positive contributor at his job, to society and to those friends and family who love him. We will always support him.

The charge he now faces is the thing that is out of character for Jon. He admits serious remorse for his wrongdoing . My feeling is that he was naive to the severity of his actions and I can pretty much assure you that he will follow the law and has already learned a very hard lesson. Jon's immediate family (his mother is disabled) as well as his grandmother and the rest of those close to him, will suffer if he is unable to help us in so many tangible and intangible ways.  The grief we feel for Jon is hard to measure regarding how one mistake can alter an otherwise exemplary good life. I think a tough sentence will especially impact the life of his grandmother who he speaks to regularly. When imposing a sentence, I hope you can do so with the utmost leniency. Thank you for considering my heartfelt comments.

Susan Rausch, 14892 Strand Lane, Delray Beach, FL 33446. Cell (517) 927-2871

Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY  10007


Dear Judge Ramos:

   This letter is written in regards to our son Jon Becker's sentencing.  It seems a difficult task to describe in the confines of this letter, just what a wonderful human being Jon is, someone we are tremendously proud to have as a son.   I am confident that all who know Jon can attest to his strong character and work ethic.

   Jon's mother, Kathy,  a physical therapist, and myself, Robert, a doctor of optometry, are both 68 years old.  Jon, after graduating high school, attended SUNY Plattsburgh, and graduated with a bachelor's degree after 4 years.

   He worked several jobs after that to support himself, always as a valued employee.  Wanting to contribute more to his community,  he took the EMT training course, and upon successfully getting certified, worked as a volunteer for the local ambulance service, helping to care for people in their most dire times of need.  Selflessly helping people has been a staple of his life.

   While also working as a health club personal trainer, he so impressed his client, a CFO of an elevator service company, he was recruited to work for him there.  He started as an apprentice mechanic, diligently studied and learned all aspects of the field, and was promoted to full mechanic after 3 years.  He has been there since, and is looked upon as one of their most trusted and reliable elevator mechanics.  It is a job where mistakes can be deadly.

   Jon has never remotely been in any legal trouble before this.  He never had even a minor school infraction, quite the opposite, he was always a model student, heavily involved in sports.

   In recent years, Jon has suffered debilitating health problems.  He has had the fortitude to dedicate himself to a rigorously healthy lifestyle of diet and exercise in an effort to limit the associated pain, without ever resorting to prescription or recreational drugs, and still be able to work.  He has abstained from alcohol for the past dozen years for health reasons too.

   Jon has been remorseful about the crime he has pleaded guilty to.  He has had no association with his former friend and apartment mate who involved him and will not.   It's a cliche, but it fits perfectly to describe Jon as "honest to a fault".

   His friends and family are holding out faith in our judicial system that your honor will be able to see the facts of this case and render a just sentence.  I hope this letter helps in a small way to better understand the anomaly of his actions in this case when weighed against the rest of his life.   As I feared, it was a difficult task to convey who Jon truly is in a letter.   That he is someone with a great strength of character who always strives to do good.   Thank you for reading.

Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

Dear Judge Ramos:

   I am Zelda Becker, the grandmother of Jonathan Becker.  I am 96 years old and live independently in Florida.  Previously I lived with my late husband in New York near Jon and family, so we were close to Jon throughout his childhood and into adulthood.   We babysat and cared for Jon for those many years.  He was always a joy to be with and we were both very proud of his school and athletic achievements.

   Now the roles are somewhat reversed and as I've needed more help, Jon has always been there for me.  He would come to my house in New York and do whatever was needed, housework, repairs, etc.  He is always generous with his time and energy to be of help.  Now that I'm in Florida, he comes to visit even though he has had limited vacation time.  He'll help me with things here, but also spend the day with me playing miniature golf or driving us to the beach.  He is very compassionate and makes me feel capable.  He is always kind and caring for me and will go out of his way to help strangers too.  Once he is back home, he calls me weekly just to talk.  I greatly look forward to his phone calls.

   My love for Jon and his future has no bounds.  I can attest to his integrity and character.  I implore Your Honor to be lenient in your judgment.  Thank you for accepting this letter and your kind consideration.

                              Sincerely,
                              Zelda Becker

Julian Gialanella
Blue Mingo Grill
6098 NY-80
Cooperstown, NY 13326

November 26, 2023

Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Honorable Edgardo Ramos,

My name is Julian Gialanella, I currently reside in Cooperstown, NY where my wife and I manage a Restaurant and Marina. I am writing to you regarding a longtime friend of mine, Jon Becker. I understand Jon has pleaded guilty; however, I would like to provide you information about Jon in hopes of giving you a better understanding of who Jon truly is.

I was in college when I met Jon, roughly 13 years ago. Jon is a soft spoken, well mannered, kind hearted person, with a great sense of humor. Jon and I are very different. Jon is quiet, reserved and focused, I was the opposite. Despite our glaring differences, Jon and I spent the majority of our college together going to the gym, playing racquetball, attending early morning spin classes, studying together as well as eating most meals together.

After college, although we may have separated physically, Jon and I have remained friends. My life has taken me in many different directions after graduating college and Jon has remained one of my longest lasting friendships throughout. Although we have only seen each other a handful of times, we remain in touch and even after long periods of no communication we seem to pick up where we left off. Jon is someone I have and still do rely on through these years as a friend and someone I can always count on, no matter the situation.

From afar I have watched Jon's career bloom. I remember when he started working on elevators as an apprentice and excelled to where he is today. Jon is a hardworking, smart, well-rounded human. It does not surprise me that he has excelled in his career, knowing what a dedicated person he is.

I am aware of Jon's situation, although only peripherally. Regardless of what has transpired, I would like to remind you that Jon is a good person. The past few years as this situation has progressed, escalated and evolved, I have noticed how it has impacted Jon. Although we haven't seen each other in many years, I have noticed a somber shift in his demeanor and communications.

Admittedly, I am not knowledgeable enough to understand the immense size of this situation, but I can gather bits and pieces to scratch the surface of understanding it. It is heart breaking. I can't imagine my good friend Jon, being in this situation. I do know he is regretful, as one would expect at this juncture.

As with any situation, there are many sides to a story and many factors to consider. I do ask that you please take into consideration who Jon is deep down. Jon is a young man with an abundance of potential. Jon has the ability to positively contribute to society. I hope to see Jon continue to excel in his career. I hope to see Jon become a father one day. Most importantly, I hope to see Jon on the other side of this chapter of his life.

Jon is not a statistic. Jon deserves a second chance. Please.

Warm regards,


Julian Gialanella