UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

       :

UNITED STATES OF AMERICA

       :

      - v. -            :        S2 22 Cr. 395 (ER)

       :

JONATHAN BECKER,

       :

        Defendant.

       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Kiersten A. Fletcher
Nicolas Roos
Negar Tekeei
Assistant United States Attorneys
- Of Counsel -

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY....................................................... 1

    A.  Offense Conduct……………………………………………………………………..1
    B.  Procedural History……………………...…………………………………………6
    C.  Presentence Investigation Report…………………………………………………6

APPLICABLE LAW…………………………………………………………………..…7

DISCUSSION ......................................................................................................................... 8

    A.  The Need to Reflect the Seriousness of the Offense and Promote Respect for the Law….8
    B.  The Need to Provide Just Punishment for the Offense……………………………9
    C.  The Need to Afford Adequate Deterrence……………………………………….....10
    D.  The Defendant's Section 3553(a) Arguments Do Not Warrant a
        Non-Custodial Sentence…………………………………………………………12

CONCLUSION.................................................................................................................... 16

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Jonathan Becker ("Becker" or the "defendant") scheduled for December 19, 2023. Over the course of several days in early 2021, Jonathan Becker purchased thousands of shares of Pandion stock based on inside information that news was going to be released that would "triple" Pandion's stock price. When the news was announced that Pandion was going to be acquired, Becker destroyed the evidence of his communications with others who traded in Pandion, sold his shares, and personally obtained more than $266,000 in profits. ███████████████ ███████████████████████████████████████████ ████████████████████████████████████ Accordingly, and for the reasons set forth below, the Court should impose a sentence within, but at the bottom of, the agreed-upon United States Sentencing Guidelines range of 18 to 24 months' imprisonment. Such a sentence would be sufficient but not greater than necessary to serve the legitimate ends of sentencing.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. Offense Conduct

In early 2021, Seth Markin and Brandon Wong together made more than $1.4 million in illegal profits by trading in stock based on inside information that Markin stole from his then-girlfriend (the "Law Firm Associate"), who was at the time an attorney at a major law firm in Washington D.C.. PSR ¶ 8.[1] In February 2021, Markin secretly looked through the Law Firm Associate's confidential work documents, without her permission, and learned that, in a matter of

---

[1] "PSR" refers to the final Presentence Investigation Report, filed by the United States Probation Department on December 12, 2023, 2023; "Dkt. [Number]" refers to a docket entry in this case. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

weeks, Merck & Co. ("Merck"), a publicly traded pharmaceutical company, was going to acquire Pandion Therapeutics ("Pandion"), a publicly traded biotechnology company, for approximately three times the value of Pandion's share price. *Id.*

Markin and Wong together purchased hundreds of thousands of dollars' worth of Pandion shares based on the material non-public information Markin stole from his then-girlfriend. PSR ¶¶ 9-10. In addition, Markin and Wong agreed to tell others to trade based on this information, and in total told at least ten other people to purchase Pandion shares, causing some of the people he tipped to purchase tens or hundreds of thousands of dollars' worth of Pandion stock. *Id.* ¶¶ 10-13.

In or about February 2021, Markin told his relative, a co-conspirator not charged in this case ("CC-1") to purchase Pandion shares. *Id.* ¶ 12. On February 14, 2021, CC-1 told Becker, who was then his roommate, to purchase Pandion. *Id.* On the same date, Becker texted another friend ("CC-2") that "[a] new opportunity has emerged . . . with insider info." *Id.* Before the market opened on February 16, 2021, CC-1 told Becker that Markin had suggested doing a limit order at "19 or 18 [dollars per share]" so that they "could get [the stock] at a dollar or two cheaper." Becker responded with skepticism: "Why would the stock drop 5 to 10% days before a huge announcement? Even if there was a possibility to get it at a lower price it is totally irrelevant if he thinks the price is going to triple. Why care if you own at 18, 19, or 20 when it's going to $60? Better just to get in asap so you don't get in too late ...." Becker continued to question CC-1, who assured him that Markin and Wong were "all in 100% confidence." Becker continued to ask why Markin would suggest a limit order, and told CC-2 about these conversations, texting, "why the fuck do I care if I buy at $18, $19, or $20 if you think it's going to $60....id rather just get in and

not miss the announcement...this is looking less and less enticing." Becker added, "I don't see why 15 cents matters if this is rocketing 100% man."

An hour before the market opened on February 16, 2021, the first day the stock market was open after Becker received information about Pandion from CC-1, Becker texted CC-1, "I will give you $10,000 if you can get your cousin to say he is 100% certain he has insider info that news is coming out which will send the stock up." Despite getting no such assurance, Becker began purchasing thousands of shares of Pandion when the market opened that day. Becker also told at least three friends and relatives to do the same, including CC-2 and others ("CC-3" and "CC-4"). In the days that followed, Becker repeatedly questioned CC-1 regarding the likelihood and timing that the "news" was going to be announced. On the morning of February 17, Becker asked CC-1 whether there was "any update on the news" and if it was "still coming this week." CC-1 told Becker he would keep him posted, and said "it should happen over the next 48 hours."[2] Becker responded, "My only concern is that he knows there is actual news being released that will move the stock considerably. I have a years salary in the stock." CC-1 replied, "nothing has changed since first telling about this." Later in the conversation Becker stated, "You said it was a sure thing that he has inside info and it's going to triple."

As Becker received updated information from CC-1, including changes to the timing of the "news," he shared that information with CC-2, telling him, "Apparently the news will NOT be announced tomorrow. Maybe by end of week now...according to what [CC-1] says his cousin said." On February 19, 2021, Pandion announced it was going to present at a health care conference. Becker sent a link to the press release to CC-1 and wrote, "This has to be the news

---

[2] In fact, by February 17, 2021, Merck and Pandion had completed their work and they were just waiting on Merck's completion of vendor site visits before the deal would be announced.

release that will drive the stock. Next Thursday." CC-1 responded, "Wow. It's all comin together." Becker replied, "Yup. This is a good sign." On February 20, 2021, Becker sent the same press release to CC-2 and wrote, "Thursday is take off… All aboard the panda express." On February 22, 2021, Pandion issued another press release and its stock price rose to $26 per share. CC-1 checked with Markin and then texted Becker, "Ok it's not the news." Becker asked whether CC-1 was "sure there is more news to come this week," and CC-1 responded, "He [Markin] said it is certainly not the news." The next day, February 23, 2021, Becker purchased additional shares of Pandion. On February 24, 2021 – one day before the announcement of Merck's intention to acquire Pandion, Becker texted CC-1 and CC-2, "1 day away from retirement."

After Merck's acquisition of Pandion was announced publicly on February 25, 2021, and Becker's Pandion stockholdings significantly increased in value, the defendant sold his shares of Pandion for more than $266,000 in profits. PSR ¶ 14. Collectively, the individuals tipped by Becker themselves made more than $200,000 in profits.

In or about November 2021, Special Agents from the Federal Bureau of Investigation interviewed the defendant at his home in New Jersey in connection with an investigation they told him was being conducted by law enforcement in the Southern District of New York relating to insider trading in Pandion stock. PSR ¶ 12. During the interview, Becker told the agents he traded Pandion shares based on information obtained from CC-1 and Wong, but denied knowledge that Pandion was going to be acquired by Merck. Becker also admitted that he told others to trade Pandion, including CC-3, who was then-employed as a Special Agent with the Federal Bureau of Investigation.

███████████████████████████████████████████████

███████████████████████████████████████████████



██████████████████████████████████████

██████████████████████████████

**B. Procedural History**

On September 20, 2023, the defendant pled guilty, pursuant to a plea agreement (the "Plea Agreement"), to Count One of the S2 Information, and admitted that he committed securities fraud by insider trading when he purchased Pandion shares based on information from CC-1. The same day, the United States Securities and Exchange Commission ("SEC") filed a complaint and proposed settlement resolving civil insider trading claims. *See SEC v. Becker*, 23 Civ. 8331 (JHR) (S.D.N.Y. Sept. 20, 2023).

**C. Presentence Investigation Report**

The Probation Office, consistent with the Plea Agreement,[3] concludes that Becker has a total Guidelines offense level of 15, calculated as follows:

1. The applicable Guidelines manual is the November 1, 2023 edition.

2. Pursuant to U.S.S.G. § 2B1.4, the base offense level for the offense is eight.

3. Pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(G), because the gain resulting from the underlying offense, insider trading by the defendant's brother, was more than $250,000 but less than $550,000, 12 levels are added.

4. The base offense level for the underlying offense governed by U.S.S.G. § 2B1.4(b)(1) is therefore 20.

5. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to

---

[3] Though the Plea Agreement referenced the November 1, 2021 Guidelines manual, it noted the parties' agreement that Becker be sentenced in accordance with amendments to the Guidelines to anticipated to take effect in November 2023.

U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

6. Pursuant to U.S.S.G. §§ 4C1.1(a)(1)-(10), the defendant is a Zero-Point Offender, and the offense level is reduced by two levels.

PSR ¶¶ 27-37. Because Becker has no criminal history, he is in Criminal History Category I. Based on a total offense level of 15 and a Criminal History Category of I, Becker's Guidelines range of imprisonment, consistent with the Plea Agreement, is 18 to 24 months' imprisonment. PSR ¶ 90.

The Probation Office recommends a sentence of three months' imprisonment, to be followed by one year of supervised release. PSR at 27. In making its recommendation the Probation Office relays that the defendant "was well aware of his illegal conduct when he engaged in the instant offense" and has "accepted limited responsibility" for his role. *Id.*

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors set forth in Section 3553(a) to the defendant's conduct, a sentence at the bottom of the Guidelines range is warranted in this case.

### A. The Need to Reflect the Seriousness of the Offense and Promote Respect for the Law

The nature and seriousness of the offense and the need to provide just punishment and promote respect for the law warrant a significant sentence, and specifically one of 18 months' imprisonment. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The defendant engaged in a course of illegal conduct over a period of several days in 2021, conducting illegal securities trades and encouraging friends and family members to do the same in anticipation of news about Pandion that was projected to triple its stock price. Once the Merck/Pandion acquisition announcement was made, the defendant personally reaped more than $266,000 in profits from his own Pandion trades, and his friends and family made another $200,000. And, following the announcement of the

acquisition, the defendant and CC-1 took steps to delete the relevant communications that might prove their crimes and the participation of the individuals the defendant tipped.

While the defense submission focused on the defendant's upbringing and professional disappointments, the defendant did not commit these crimes out of any genuine financial need. He is a single man who was employed and far more financially stable than countless defendants who commit crimes in this District and who are, at least in part, motivated by financial instability. A significant sentence is necessary to reflect the seriousness of the defendant's offense and to promote respect for the law.

### B. The Need to Provide Just Punishment for the Offense

The need to provide just punishment for the offense also militates in favor of a Guidelines sentence in this case. Insider trading is a serious crime. A fundamental purpose of the securities laws is to outlaw deceptive practices in the securities markets. Insider trading undermines the public's confidence in the capital markets and deters ordinary investors from investing in those markets because of the perception that they are rigged by well-connected individuals who are willing to provide an unfair informational advantage to their associates, or in this case to their family members.[4]

---

[4] *See* Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044, ("Insider trading damages the legitimacy of the capital market and diminishes the public's faith . . . . [T]he small investor will be—and has been—reluctant to invest in the market if he feels it is rigged against him."); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"); Arthur Levitt, A Question of Integrity: Promoting Investor Confidence by Fighting Insider Trading, in Vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1, 1998) ("The American people see it, bluntly, as a form of cheating.").

The defendant's criminal activity has broad, systemic consequences, including a tendency to undermine the integrity of U.S. financial markets. Rather than engaging in fair and legitimate investing activity, the defendant used the illegal edge he got from stolen information about a contemplated merger to guarantee himself and his loved ones hundreds of thousands of dollars in profits. This activity undermines the public confidence in the fairness of financial markets and erodes the public's trust. The Court should take these broader consequences into account in fashioning a sentence that is just and that promotes the rule of law. It must send a message to the investing public that traders like the defendant will not be permitted to game the system to get guaranteed profits.

### C. The Need to Afford Adequate Deterrence

The need to afford adequate deterrence likewise weighs heavily in favor of a Guidelines sentence here. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 382, 3259); *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district

court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). As the *Martin* Court noted: "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *Martin*, 455 F.3d at 1240; *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

The need for the sentence imposed to further general deterrence is acute here, particularly where the Guidelines range is already relatively modest. The specifics of Becker's conduct, which involved tipping multiple additional people to engage in illegal trading and then taking steps to conceal his crime, highlight the consequences of insider trading crimes and the importance of dissuading potential offenders from engaging in insider trading. Particularly given Becker's efforts to conceal his crimes through the deletion of relevant communications, Becker's sentence must be significant enough to match the seriousness of Becker's offense in order to achieve general deterrence in light of the difficulty of detecting and proving illegal insider trading when people like the defendant communicate over encrypted applications and delete evidence of their crimes after the fact. *See Gupta*, 904 F. Supp. 2d at 355 (noting that because insider trading is a difficult crime to detect, putative offenders must be made to understand that there are serious consequences to getting caught). Without a significant sentence, the relative simplicity of committing that crime

and the underlying offense and the challenge of detecting that conduct would incentivize insiders similarly situated to the defendant to engage in similar offenses.

### D. The Defendant's Section 3553(a) Arguments Do Not Warrant a Non-Custodial Sentence

Becker argues that ███████████████ and his personal history and characteristics counsel in favor of a non-custodial sentence. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

*First*, the Government, of course, recognizes that, after being told he would be charged with federal crimes, the defendant chose to ███████████████, accept responsibility for his actions, enter a plea of guilty, and forfeit the gains he made from his Pandion trades prior to being charged by a grand jury.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

*Second*, "[a]lthough the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct is a factor district courts must

consider under 18 U.S.C. § 3553(a)(6) when imposing a sentence, that provision does not require a district court to conform its sentence to any single other sentence adduced by a defendant." *United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) (citing *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016)).

As the Government argued when Brian Wong was before the Court for sentencing, no two cases are alike, and no two defendants are alike. But Becker's efforts to present himself as less culpable than Brian Wong are unavailing in light of the fact that Brian Wong was convicted of accessory after the fact, and Becker stands before the Court having pled guilty to insider trading.[5] Courts in this district have repeatedly sentenced individuals convicted of insider trading to terms of incarceration. *See, e.g., United States v. Polevikov*, 21 Cr. 774 (LJL) (defendant sentenced to 33 months' imprisonment following pre-indictment guilty plea); *United States v. Buyer*, 22 Cr. 397 (RMB) (defendant sentenced to 22 months' imprisonment following trial); *United States v. Bhardwaj*, 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment following guilty plea).

And the cases cited by the defendant, *see* Def. Mem. 19-20, are distinguishable. For example, in *United States v. Robert Stewart*, 15 Cr. 287, defendant Robert Stewart was the recipient of MNPI from his son but did not tip anyone else, and received a sentence of probation, Def. Mem. 20; his son, Sean Stewart, received a 36-month custodial sentence after trial and then a 24-month sentence following a retrial. Moreover, Sean Stewart received little personal pecuniary gain from his crime. Here, the defendant was both a tippee who personally profited from the crime, and a tipper who brought others into his criminal scheme. In *United States v. Peltz*, No. 21 Cr.

---

[5] In addition, contrary to counsel's assertions, Brian Wong and Becker are both two levels down the tipping chain from Seth Markin, who tipped Brandon Wong and CC-1 directly.

154 (E.D.N.Y. Oct. 31, 2022) (NGG), the sentence of probation was imposed following the Government's agreement that the defendant presented "compelling facts regarding the defendant's upbringing and family circumstances," which the defense argued included "extraordinarily tragic" personal circumstances. Dkt. 59, 61. It was also imposed in consideration of the fact that the defendant in that case was the primary caregiver for his sister. Dkt. 61. Nothing in Becker's background or circumstances rises to this level so as to justify a non-custodial sentence in this case.[6]

Indeed, with respect to Becker's personal history and characteristics, the Guidelines adequately take into account Becker's lack of criminal history, and a sentence at the bottom of the range fairly reflects Becker has long had the support of his family and friends and endured some personal struggles. But, notwithstanding some modest personal struggles, Becker stands in stark contrast to scores of other defendants who commit crimes against a backdrop of devastating financial hardship, abuse, or other exceptionally difficult life circumstances. In other words, Becker's personal history and circumstances, and the letters of support he submits, do not mitigate the nature and seriousness of his criminal conduct, and they do not obviate the need for a sentence of incarceration that would serve as just punishment and afford adequate deterrence to criminal conduct.

In sum, the fact that certain other insider traders have received very short sentences of incarceration does not show that such a sentence would be appropriate here. ████████

████████████████████████████████████████

████████████████████████████████████████

---

[6] Even *United States v. Tsai*, No. 19 Cr. 675 (S.D.N.Y. Jan. 17, 2020) is distinguishable, as in that case the Probation Office recommended probation. Here, the Probation Office recommends a sentence of incarceration.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████  Instead, the sentence here should reflect the particular facts and circumstances of this crime – the defendant's involvement in a brazen insider trading scheme for which he personally made hundreds of thousands of dollars and tipped multiple other people to do the same. A sentence at the bottom of the Guidelines range is warranted in this case.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence at the bottom of the applicable Guidelines range of 18 to 24 months' imprisonment would be sufficient but not greater than necessary in this case.

Dated:  New York, New York
        December 12, 2023                          Respectfully submitted,

                                                   DAMIAN WILLIAMS
                                                   United States Attorney

                                            By: _____/s/_____
                                                   Kiersten A. Fletcher
                                                   Nicolas Roos
                                                   Negar Tekeei
                                                   Assistant United States Attorneys