UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                           :

UNITED STATES OF AMERICA

                           :

         - v. -                                No. 22 Cr. 395 (ER)

                           :

BRANDON WONG,

                           :

           Defendant.

                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## THE GOVERNMENT'S SENTENCING SUBMISSION

 

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Nicolas Roos
Negar Tekeei
Assistant United States Attorneys
- Of Counsel -

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY.......................................... 2

    A.    Offense Conduct Overview................................................................. 2

    B.    Illegal Trading in Pandion Shares and Tipping Friends and Family ..................... 3

    C.    Profits from Pandion Illegal Trading ...................................... 5

    D.    Efforts to Conceal their Illegal Trading ...................................... 6

    E.    Acceptance of Responsibility and Proffers with the Government......................... 6

    F.    Procedural History ............................................................... 7

    G.    Presentence Investigation Report ........................................... 7

APPLICABLE LAW ...................................................................................................... 8

DISCUSSION ............................................................................................................... 9

    A.    A Guidelines Sentence Is Necessary Because of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment for the Offense ......................... 10

    B.    A Guidelines Sentence Is Necessary for General and Specific Deterrence.......... 12

    C.    The Applicable Sentencing Guidelines Range Is an Appropriate Range Here............................................................................................ 15

    D.    A Guidelines Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities ......................................................................... 17

    E.    The Defendant's Acceptance of Responsibility Merits a Sentence at the Bottom of the Guidelines or a Modest Variance ................................... 18

CONCLUSION................................................................................................................ 19

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Brandon Wong scheduled for January 26, 2024.  Over the course of several weeks in early 2021, Brandon Wong purchased thousands of shares of Pandion Therapeutics ("Pandion") stock based on confidential information that Wong's friend—defendant Seth Markin—had secretly stolen from his girlfriend, a law firm associate who was working on the acquisition of Pandion. Wong knew that the information was stolen.  And yet he poured as much money as he could into the stock, while also encouraging his brother and friends to buy the stock. When Pandion's acquisition was announced, Wong sold his stock, making over $1 million. As Wong declared to one of his friends that he had tipped, "Me and my friend went ALL IN. We [p]ut our entire life savings in it. … I'm a millionaire." Wong proceeded to purchase Markin a $38,000 Rolex watch, purchased two Rolex watches for himself, paid for a trip with Markin to Hawaii, paid for a $2,000 dinner at Chef's Table at Brooklyn Fare in New York, rented a McLaren 720 from the Classic Car Club Manhattan, and spent $100,000 on a home in Florida. Not satisfied with their Pandion windfall, Wong and Markin discussed continuing to misappropriate confidential information from Markin's girlfriend so that they could "do another all-in" with "100% certainty" and "make bank off it again." Wong's brazen insider trading warrants a custodial sentence, one that is within though at the bottom of the applicable Guidelines range.

Wong's trading was not a one-day lapse in judgment, but rather a strategy over a series of weeks, which he hoped to extend to other stocks. He knew exactly from where the insider information came, and how Markin acquired it. He went "all in" and made more in profits than any other trader. He is responsible for the trading of eight other people. He spent his ill-gotten gains on lavish expenditures. He concocted a cover story with Markin. He initially lied to agents

when he was approached. Besides Markin, who misappropriated the inside information and also lied to federal agents, Wong is the most culpable trader connected to this scheme. His conduct and the need for general and specific deterrence warrant a custodial sentence in line with sentences imposed on similarly situated defendants in this District.

Wong did, however, demonstrate immediate acceptance of responsibility. He was prepared to plead guilty immediately upon his indictment, if not earlier. As Markin's trial was approaching, the Government proffered Wong on two occasions, and produced those proffer notes as Jencks Act material. While the Government did not continue proffering Wong after Markin's plea, and Wong has not provided "substantial assistance," his interest in going down the path of cooperation is further evidence of his acceptance of responsibility.

Accordingly, and for the reasons set forth below, the Court should impose a sentence within, but at the bottom of, the United States Sentencing Guidelines range of 30 to 37 months' imprisonment.  Such a sentence would be sufficient but not greater than necessary to serve the legitimate ends of sentencing.

<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

**A.      Offense Conduct Overview**

In early 2021, Seth Markin and Brandon Wong together made more than $1.4 million in illegal profits by trading in stock based on inside information that Markin stole from his then-girlfriend, who was at the time an attorney at a major law firm in Washington D.C.  PSR ¶ 13.[1]  In February 2021, Markin secretly looked through his girlfriend's confidential work documents,

---

[1] "PSR" refers to the final Presentence Investigation Report, filed by the United States Probation Department on June 30, 2023; "Ind." refers to Indictment 22 Cr. 395; "Dkt. [Number]" refers to a docket entry in this case.  Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

without her permission, and learned that, in a matter of weeks, Merck & Co. ("Merck"), a publicly traded pharmaceutical company, was going to acquire Pandion, a publicly traded biotechnology company, for approximately three times the value of Pandion's share price.  *Id.*

Markin immediately purchased Pandion stock on the basis of this material non-public information and also told several family members and friends to purchase Pandion's stock, causing Wong, another friend, and several family members to do so.  *Id.* ¶ 14.  In text messages, Markin assured Wong that he was "not uncertain" that when the "news drop[ped]" about Pandion, the price would "EXPLODE" and they would earn "triple gains."  *Id.*

Wong purchased hundreds of thousands of dollars' worth of Pandion shares based on the material non-public information he received from Markin.  *Id.* ¶ 15.  In addition to his purchases of Pandion stock, Wong told at least seven other people to purchase Pandion shares, causing some of the people he tipped to purchase tens or hundreds of thousands of dollars' worth of Pandion stock.  *Id.*

In total, Markin and Wong together caused at least twenty people to trade in Pandion stock based on the material non-public information that Markin misappropriated from his girlfriend, resulting in millions of dollars of illegally obtained trading profits.  *Id.* ¶ 16.

**B.      Illegal Trading in Pandion Shares and Tipping Friends and Family**

Between on or about February 7, 2021, which was the day Merck submitted a proposal to buy Pandion, and on or about February 9, 2021, Markin tipped Wong and encouraged him to purchase shares of Pandion.  Ind. ¶ 14.  On or about February 7, 2021, Markin texted Wong over an encrypted messaging application that Markin "went IN" on a certain stock in "every portfolio." *Id.*  On or about February 9, 2021, Markin and Wong spoke by phone, after which, on or about February 10, 2021, Wong purchased Pandion shares valued at more than $100,000.  Neither Markin nor Wong had ever purchased shares of Pandion prior to February 2021.  *Id.*  In text

messages, Wong told Markin that if he made a lot of money, he would buy Markin a "nice android" and that he would take them to a "fancy restaurant." *Id.* Markin countered that he wanted a Rolex watch. *Id.*

Throughout the next several days, Wong continued to purchase shares of Pandion based on material non-public information conveyed to him by Markin. *Id.* ¶ 15. Markin encouraged Wong to buy more shares, telling him that the stock was going to "EXPLODE tomorrow or by weeks end" when the "news drops" and that they were going to get "TRIPLE GAINS!" *Id.* In order to maintain the secrecy of what they were doing, MARKIN and WONG agreed that they would refer to Pandion as "Panda," and use the "🐼" emoji in text messages. *Id.*

By in or about February 15, 2021, Markin learned about Merck's decision to delay closing the acquisition of Pandion. Markin told Wong that "the news that was supposed to come out this week may come out next week." *Id.* ¶ 16. Markin, however, assured Wong that "seeing how nobody (except the insiders) . . . knows the news is coming it shouldn't effect [sic] the price." *Id.* Two days later, Markin tipped Wong that "everything is ready for the news to drop" and that the only holdup was that one of the company's CEOs needed to sign the deal documents. *Id.* Markin added, "Literally any day now. All the work is done." *Id.* Markin and Wong were so confident in the material non-public information that Markin had misappropriated that they both repeatedly told each other over text message, "we are not uncertain" and "🐼 is not unknown." *Id.*

Because they believed that the announcement of Pandion's acquisition would have a significant positive effect on Pandion's share price – likely multiplying it by three – Markin and Wong put nearly all their available funds into the stock. *Id.* ¶ 17. Markin drained his checking account and then withdrew approximately $35,000 from his savings account to purchase more Pandion stock. *Id.* Wong told Markin that he was investing all of his money, was going to sell all

of his other stocks, take out a six-figure loan, borrow against his life insurance, take money from his mother, and use cash he received in red envelopes for Chinese New Year to purchase more Pandion stock.  *Id.*  Markin and Wong also agreed that they would tell their family members and friends about the stock, and both did so.  *Id.* ¶ 18.

For example, in February 2021, Wong told his brother, Brian Wong, that Pandion was going to make an "announcement" that was not "public info" but was "big news," and that the share price was going to "🚀" upward.  PSR ¶ 17.  Brian Wong purchased thousands of shares, and also told several friends to purchase Pandion shares.  *Id.*

### C.    Profits from Pandion Illegal Trading

After Merck's acquisition of Pandion was announced publicly, and the Pandion stockholdings of Markin, Wong, and those whom they tipped, significantly increased in value, Markin and Wong sold their shares of Pandion for significant profits.  PSR ¶ 18.  In total, Markin and Wong, together, purchased more than 35,000 shares of Pandion stock based on material non-public information that Markin had misappropriated from his girlfriend.  Ind. ¶ 19.  Markin and Wong also caused their family members, friends, and acquaintances, directly and indirectly, to purchase more than 26,000 shares of Pandion.  *Id.*  On or about February 25, 2021 and later, after the news of Pandion's acquisition became public, Markin sold the majority of his Pandion shares and made more than $80,000 in net profits from his insider trading.  PSR ¶ 18.  Wong also sold all of his Pandion shares after the acquisition was made public and made more than $1.3 million in net profits from his insider trading.  *Id.*

After Wong sold his Pandion stock, he told Markin that he was going to "call up my Rolex man" and tell him "I want matching panda watches."  Ind. ¶ 20.  Wong subsequently purchased two Rolex watches for himself for approximately $55,000, and a Rolex watch called the "Panda"

for its design and coloring, which he presented to Markin as a thank you gift for the Pandion stock tip, and that was valued at approximately $40,000. *Id.*; PSR ¶ 18. Wong also told Markin "all the vacations are on meee [sic]," and paid for expenses during a trip to Hawaii for both of them where they stayed at luxury hotels. Ind. ¶ 20. Wong also treated Markin to a tasting menu at a three-Michelin-starred restaurant in Brooklyn, New York, that cost more than $1,000 for the meal. *Id.* Using his illicit insider trading profits, Wong also purchased a home in Florida. *Id.*; PSR ¶ 18.

### D.   Efforts to Conceal their Illegal Trading

To conceal their illegal insider trading scheme, Markin and Wong used an encrypted messaging application and deleted many of their text messages with each other. PSR ¶ 19. They also agreed on a cover story that they could provide to law enforcement, namely, that if they were asked how they anticipated Pandion's stock price increase, they could say they "read it on Stocktwits," a social media platform for sharing stock ideas, and falsely say that the news was "publicly being announced there." *Id.*

On November 18, 2021, in connection with a judicially authorized search, Wong was interviewed by special agents with the FBI, and spoke with them voluntarily without counsel present. Dkt. No. 136 at 7. Wong began the interview by explaining his trading through a version of the cover story that he and Markin had discussed. *Id.* Those statements were false. *Id.* After being advised that it is a crime to lie to federal agents, Wong admitted that he engaged in insider trading with Markin. *Id.*

### E.   Acceptance of Responsibility and Proffers with the Government

Several months passed between the search and seizure of Wong's electronic devices, and subsequent charges. Wong was not indicted until July 25, 2022. Promptly after he was charged, Wong conveyed, through his counsel, a desire to plead guilty. In November 2023, as Markin's trial was approaching, the Government proffered Wong on two occasions, and found the

information Wong provided to be credible and corroborated by other evidence obtained throughout the course of the investigation.  Shortly after each proffer, the Government produced reports of Wong's proffer statements to Markin as potential Jencks Act material.  On December 4, 2023, Markin entered a guilty plea.  The Government did not continue proffering Wong after Markin's plea.

### F.      Procedural History

On April 10, 2023, the defendant pled guilty, pursuant to a plea agreement, to Count 8 of the Indictment, and admitted that he committed securities fraud by insider trading when he purchased Pandion shares based on material nonpublic information that should not have been disclosed to him.  Dkt. 69 at 19.

### G.      Presentence Investigation Report

Using the November 1, 2021 Guidelines Manual, which was in effect at the time of the defendant's plea agreement and the preparation of the PSR, the Probation Office, consistent with the plea agreement, concluded that Wong has a total Guidelines offense level of 21, calculated as follows:

1. Pursuant to U.S.S.G. § 2B1.4, the base offense level for the offense is eight.

2. Pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(I), because the gain resulting from the underlying offense, insider trading, was more than $1,500,000 but less than $3,500,000, 16 levels are added.

3. The base offense level for the underlying offense governed by U.S.S.G. § 2B1.4(b)(1) is therefore 24.

4. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).  Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the

> Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

PSR ¶¶ 30-32.  The defendant has no criminal history points and is in Criminal History Category I.  *Id.* ¶ 43.  Thus, under the November 1, 2021 Guidelines Manual, the defendant's applicable sentencing Guidelines range was 37 to 46 months' imprisonment.  *Id.* ¶ 84.  However, pursuant to U.S.S.G. § 1B1.11, the court shall use the Guidelines Manual in effect on the date that the defendant is sentenced, and therefore the November 1, 2023 Guidelines Manual is used to determine the defendant's total offense level.  Pursuant to U.S.S.G. §§ 4C1.1(a)(1)-(10), in the November 1, 2023 Guidelines Manual, the defendant is a Zero-Point Offender, and the offense level is reduced by two levels.  Therefore, the defendant's total offense level is 19.  Accordingly, the defendant's applicable sentencing Guidelines range pursuant to the November 1, 2023 Guidelines Manual is 30 to 37 months' imprisonment.

The Probation Office, applying the November 1, 2021 Guidelines Manual range of 36 to 47 months' imprisonment, recommended a sentence of 24 months' imprisonment, to be followed by three years of supervised release.  PSR at 26.  In making its recommendation, the Probation Office noted that the defendant "significantly profited from the illegal trades" and "attempted to destroy and conceal evidence."  *Id.* at 27.  The Probation Department also observed that the defendant's "actions reveal that he was well aware of his illegal conduct when he engaged in the instant offense."  *Id.*

## APPLICABLE LAW

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the

starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

## **DISCUSSION**

Starting with the applicable Sentencing Guidelines range, and taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of his offenses, the need to avoid unwarranted sentencing disparities, and the importance of general deterrence, a custodial sentence at the bottom of the applicable Guidelines range, in line with the sentences imposed on other insider traders in this District, would be sufficient but not greater than necessary to satisfy the purposes of sentencing.

### A. A Guidelines Sentence Is Necessary Because of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment for the Offense

The nature and seriousness of the offense and the need to provide just punishment and promote respect for the law warrant a significant sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The defendant engaged in a course of illegal conduct over a period of several weeks in 2021, conducting illegal securities trades and encouraging friends and family members to do the same in anticipation of news about Pandion that was projected to triple its stock price.

From the beginning, the defendant was aware of the unlawful nature of his conduct, and nonetheless enthusiastically went "all in" with his insider trading. Starting with February 10, 2021, which was shortly after the defendant learned the confidential information from Markin, he was talking about making "big" money, buying Markin gifts, and "dining at a fancy restaurant," provided that he was "in the clear" once the news came out. Over the next few weeks, Markin and Wong celebrated the "triple gains" they knew would come while hatching a cover story that they would tell if they got caught. After Pandion's acquisition was publicly announced on February 25, 2021, Wong sold his shares and made $1,349,134.40 in profit. He texted Markin, "All the vacations are on me[].  I'm going to call up my Rolex man." As described above, Wong bought Markin a $38,000 Rolex watch, paid for a trip to Hawaii for both of them, took Markin to a dinner at Chef's Table at Brooklyn Fare in New York that cost approximately $2,000, he purchased two Rolex watches for himself (the value of which were $55,000), and he spent $100,000 on a home in Florida that he and Markin were going to live in together as roommates.

After selling his stock and spending the proceeds, Wong and Markin talked about getting more confidential information to insider trade again. Over the course of a month after selling his Pandion stock, Wong texted with Markin about finding another opportunity to go "all in" on, and suggested that Markin could get his girlfriend "drunk" and "get her back on M&A," seemingly

suggesting that Markin might be able to learn more insider information about mergers and acquisitions that way.

While, as the defendant argues, he did not steal the non-public information himself, *see* Dkt. No. 136 at 21, he jumped at the opportunity to use the stolen information, traded on it repeatedly, tipped others, and sought out more information after making a profit. Wong is different from traders who simply receive a tip and trade on it, and then later argue it was a momentary lapse in judgment. His reaction to receiving the information, the successive trades, the tipping, and the desire to do it again are all aggravating factors that make the defendant's crime more serious, and weigh in favor of a lengthier sentence.

The defendant's criminal activity also has broader systemic consequences, including a tendency to undermine the integrity of U.S. financial markets. Rather than engaging in fair and legitimate investing activity, the defendant used his illegal edge to guarantee himself over a million dollars in profits. A fundamental purpose of the securities laws is to outlaw deceptive practices in the financial markets. Insider trading undermines the public's confidence in the capital markets and deters ordinary investors from investing in those markets because of the perception that they are rigged by well-connected individuals who are willing to provide an unfair informational advantage to their associates, or in this case to their family members.[2] The Court should take these

---

[2] *See* Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044, ("Insider trading damages the legitimacy of the capital market and diminishes the public's faith . . . . [T]he small investor will be—and has been—reluctant to invest in the market if he feels it is rigged against him."); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"); Arthur Levitt, A Question of Integrity: Promoting Investor Confidence by Fighting Insider Trading, in Vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1, 1998) ("The American people see it, bluntly, as a form of cheating.").

broader consequences into account in fashioning a sentence that is just and that promotes the rule of law.

**B.      A Guidelines Sentence Is Necessary for General and Specific Deterrence**

A significant sentence of imprisonment is also necessary in this case to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is an important sentencing factor in fraud and white collar cases because the decision to commit fraud is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). In particular, as the Second Circuit and courts in this district have noted, significant sentences are necessary for insider traders who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when

you get caught, you will go to jail."). Indeed, research shows that enforcement actions and punishment for insider trading is effective for achieving deterrence. *See, e.g.*, Fernan Restrepo, *The Impact of Insider Trading Doctrine on the Incidence of Insider Trading: An Analysis of the Effect of the Misappropriation Theory* (Nov. 8, 2023), https://ssrn.com/abstract=4627327 (finding that the adoption of the misappropriation theory of insider trading had a meaningful deterrent effect); Robert Davidson and Christo Pirinsky, *The Deterrent Effect of Insider Trading Enforcement Actions*, Accounting Review (May 2021) (concluding that insider trading convictions have a statistically significant effect on deterrence of future insider trading).

For those reasons, it is important here to impose a significant sentence to deter future insider trading. The defendant profited over a million dollars; he tipped several friends; he was not a remote tippee; the illegality of his conduct was clear to him; he showed an interest in continuing to insider trade; he concocted a cover story; and he initially lied to the FBI. Imposing a short or non-custodial sentence would send the regrettable message to would-be insider traders that no matter how brazen the conduct is, how much profit is made, or how many people are tipped, the penalties are not serious. Without a significant sentence, the calculus for future insider traders will continue to be that the certainty of large profits outweighs the marginal risk of detection and subsequent incarceration.

The defendant argues that a non-custodial sentence would still have a deterrent effect because of the negative publicity that has resulted from the prosecution. Dkt. No. 136 at 27. Not so. The Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of

his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008). If anything, the publicity this case has received weighs in favor of a substantial sentence. This case presents an appropriate opportunity for the Court to send a strong signal to would-be insider traders, and, especially in light of the publicity to which the defendant points, an unjustifiably lenient sentence would encourage others who might be tempted to engage in insider trading that the rewards of such wrongful activity may be worth the price. *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity").

The defendant also points to the financial penalties and collateral consequences of the conviction. Dkt. No. 136 at 27-28. But financial penalties and other consequences of the conviction alone are not an adequate deterrent. Without a period of incarceration, would-be insider traders will just price in the risk of financial penalties into their overall economic calculus. Only a certainty of jail time ensures that traders are adequately deterred by the risk of an insider trading prosecution.

Lastly, in terms of specific deterrence, while the defendant is a first-time offender, a significant prison sentence plays an important role in deterring future recidivism. Although it is true that the defendant quickly accepted responsibility when caught, his communications during the course of his conduct make palpably clear that he was willing to violate the law and take steps to thwart law enforcement, including lying directly to law enforcements officers. There is therefore substantial reason to believe that this defendant would be willing to circumvent the law again without a sufficient deterrent. Further, there are many examples of first time white collar criminals in this district who become recidivists. *See, e.g.*, *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having serving a prior two-year sentence for bank and wire fraud); *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme). A term of incarceration is necessary to ensure that this particular defendant does not undertake insider trading or another form of fraud in the future.

### C.    The Applicable Sentencing Guidelines Range Is an Appropriate Range Here

The Court must also consider "the kinds of sentence and the sentencing range established" in the Guidelines. 18 U.S.C. § 3553(a)(4). Wong argues that the Guidelines are a "particular poor starting point in securities fraud cases because of their disproportionate emphasis on the amount of monetary loss." Dkt. No. 136 at 13. This argument is misguided: the current fraud Guideline is the result of extensive and iterative work by the Sentencing Commission, and is based on sound

policy choices, and the insider trading Guidelines are in line with the sentences regularly imposed in this district, as discussed below.

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). Arguing otherwise, Wong points to commentary by Judge Rakoff in *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), and *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), criticizing the application of Section 2B1.1 of the Guidelines. Dkt. No. 136 at 13.  Those cases involve a Guidelines loss amount calculation that is very different than this case. In *Gupta*, Judge Rakoff was critical of the fact that the Guidelines range for the defendant - the tippee in an insider trading case - was predominantly based upon the size of his *co-conspirator's* illegal profits where the defendant had no control over the trades and received none of the profit. 904 F. Supp. 2d at 351-52. *Adelson* involved a president of a company who joined an accounting fraud conspiracy towards its end, but because the intended loss caused by the fraud was measured by the company's drop in market capitalization after the fraud was disclosed, he was subject to a Guidelines range of life imprisonment. *Adelson*, 441 F. Supp. 2d at 515. In each of those cases, on their specific facts, Judge Rakoff concluded that the Guidelines were off-base because they relied upon arithmetic calculations and did not take into account the complex of factors that a court must consider when sentencing a criminal defendant. Even after taking that into account, Judge Rakoff noted the importance of considering general deterrence in financial-fraud cases and imposed meaningful custodial sentences.

In this case, by contrast, the loss amount is derived from the profits that the defendant made from his own trading.  This is not a case where, as in *Gupta* and *Adelson*, the Guidelines range is

based upon numbers drawn from the profits of others or market factors beyond the defendant's control. Rather, the defendant - in deciding how much to trade - fixed his own Guidelines range. The direct relationship between Wong's actions and the loss amount distinguishes the Guidelines calculations in *Gupta* and *Adelson* from the present case.[3]

The insider trading Guidelines increase progressively based on the gain by the trader and his co-conspirators. That is an appropriate measure of culpability because it reflects the fact that in many cases insider traders who make larger profits are more culpable and deserve longer sentences. Accordingly, the Court should utilize the advisory Guidelines range here as a guide in fixing the appropriate sentence for the defendant.

### D. A Guidelines Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities

Finally, the Court must consider the need to avoid unwarranted sentencing disparities. Comparing Wong's conduct to that of other similar insider trading defendants in this Circuit and throughout the United States reveals that a sentence in the Guidelines range is sufficient but not greater than necessary to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Starting with the other defendants in this case, Brandon Wong is more culpable than Brian Wong and Jonathan Becker. He made significantly more money; he knew more details of the scheme; there is ample evidence that he knew the illegality of his conduct; and he tipped at least 8 people. As the Court observed at Jonathan Becker's sentencing, Brandon Wong and Seth Markin

---

[3] In *United States v. Parris*, a third securities fraud case cited by Wong, the defendants were engaged in a two-month "pump and dump" scheme in the penny-stock market. 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008). They issued false press releases concerning the prospects of their fledgling company, whose stock price artificially spiked and then plunged. As a result of their two-month penny-stock fraud, even with no criminal history, the defendants faced a Guidelines range starting at 30 years' imprisonment. Finding that range unreasonably high in comparison with other fraud cases, the Court ultimately sentenced the defendants to 60 months' imprisonment.

are not "in the same category as either Mr. Becker or Mr. Brian Wong," and for that reason, Brandon Wong's conduct warrants a sentence significantly longer than those co-defendants. (Dec. 19, 2923 Sent. Tr. at 19.)

As compared to other insider trading defendants in this district, a Guidelines sentence is appropriate.  Courts in this district have repeatedly sentenced individuals convicted of insider trading to terms of incarceration.  *See, e.g., United States v. Stone*, No. 22 Cr. 510 (MKV) (defendant sentenced to 28 months' imprisonment following guilty plea); *United States v. Bhardwaj*, No. 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment following guilty plea); *United States v. Dikshit,* No. 21 Cr. 760 (CM) (defendant sentenced to 24 months' imprisonment following early guilty plea); *United States v. Polevikov*, No. 21 Cr. 774 (LJL) (defendant sentenced to 33 months' imprisonment following pre-indictment guilty plea); *United States v. Malnik*, No. 19 Cr. 714 (VM) (defendant sentenced to 30 months' imprisonment following guilty plea); *United States v. Collins*, No. 18 Cr. 567 (VSB) (defendant sentenced to 26 months' imprisonment following guilty plea).

Accordingly, in order to avoid unwarranted sentencing disparities, the Court should sentence Wong to a substantial sentence, at or around the bottom of the applicable Guidelines range, which is consistent with the average sentence for similarly situated defendants in this District.

### E.    The Defendant's Acceptance of Responsibility Merits a Sentence at the Bottom of the Guidelines or a Modest Variance

The defendant accepted responsibility early in this case, which is a consideration that can be taken into account at sentencing. But at the same time, acceptance of responsibility is already factored into the applicable Guidelines calculation, so it does not necessarily or in this case merit a substantial variance.

The defendant notes that he proffered twice with the Government as it began to prepare for Seth Markin's trial. That is correct, and the defendant was forthcoming and truthful at those interviews. It is also correct that the Government produced those proffer notes to Markin as Jencks Act material. But the fact that the defendant proffered with the Government is not "substantial assistance," as would merit a 5K letter, and it is not a basis for a significant variance. There was already overwhelming evidence of Markin's guilt, including the highly incriminatory text messages quoted above, the testimony of his former girlfriend, the testimony of several individuals he tipped, the presence of his fingerprints on a deal binder, his false exculpatory statements to the FBI, and his irregular trading activity. The Government's Jencks Act production to Markin also contained incriminatory statements of other likely Government witnesses. The parties here do not know what prompted Markin to plead, and there is good reason to believe it was not alone the possibility of Wong's testimony. Thus the Court should consider Wong's proffering as further evidence of his acceptance of responsibility and desire to do the right thing, but not as a basis to vary significantly and impose a non-custodial sentence.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence at the bottom of the applicable Guidelines range of 30 to 37 months' imprisonment would be sufficient but not greater than necessary in this case.

Dated: New York, New York
      January 19, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
      Nicolas Roos
      Negar Tekeei
      Assistant United States Attorneys